UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

———————————————————— x

CITY OF STERLING HEIGHTS POLICE &  :  Civil Action No. 2:13-cv-01159-CNC
FIRE RETIREMENT SYSTEM, Individually  :
and on Behalf of All Others Similarly Situated, :  CLASS ACTION
                                       :
                        Plaintiff,     :  AMENDED COMPLAINT FOR VIOLATIONS
                                       :  OF THE FEDERAL SECURITIES LAWS
         vs.                           :
                                       :
KOHL'S CORPORATION, KEVIN              :
MANSELL and WESLEY S. McDONALD,        :
                                       :
                        Defendants.    :  DEMAND FOR JURY TRIAL
                                       :

———————————————————— x

Plaintiffs (defined below) have alleged the following based upon the investigation of their counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Kohl's Corporation ("Kohl's" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about Kohl's, press releases and other public statements issued by Kohl's, and media reports about Kohl's. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of purchasers of the common stock of Kohl's between February 26, 2009 and September 13, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. As alleged herein, Kohl's and its two highest-level executive officers – President and Chief Executive Officer ("CEO") Kevin Mansell ("Mansell") and Chief Financial Officer ("CFO") Wesley S. McDonald ("McDonald"), who are named as defendants along with Kohl's (collectively, "Defendants") – consciously or recklessly disregarded significant deficiencies in the Company's lease accounting practices and its failure to present financial statements in conformity with generally accepted accounting principles in the U.S. ("GAAP").

3. As detailed below, Defendants misled the investing public on multiple occasions by claiming they had undertaken a detailed review of such accounting practices and that errors they had identified were immaterial. In disregard of GAAP and the risk of misleading investors, they also disseminated financial information they knew was inaccurate and would be restated. In short, Defendants gamed the system by using lease accounting strategies to avoid properly accounting for the costs associated with improvements on the properties leased for the Company's stores, when, in fact, the practices masked and materially understated its debt and liabilities and overstated its equity. In the best possible light, this is a prime example of recklessness; the worst, conscious misbehavior.

4. On November 4, 2010, Kohl's announced that it had undertaken a "detailed review of its historical accounting" for leased properties that resulted in various corrections, but represented that the corrections were not material to its previously reported financial statements. On December 9, 2010, Kohl's again disclosed that it had "identified various errors in [its] accounting for leased properties and completed a detailed review of each of [its] leases." The "errors" resulted from flaws in its lease accounting practices, including a failure to properly: (i) determine the commencement of lease terms; (ii) record depreciation on certain assets consistent with the rent or lease obligation period; and (iii) classify and record landlord reimbursement of construction-related costs for leasehold improvements as prepaid rent or rent incentives.

5. Despite the fact that these flaws resulted in "errors" that rendered the Company's financial statements inaccurate and therefore false and misleading, Defendants assured the public – in November and December 2010 – that the impact of the issues required "corrections" that "[we]re not material to [its] previously reported financial statements . . . ." In fact, in disregard of the extent and significance of the lease accounting errors and their impact on the financial statements, Defendants indicated in December 2010 that Kohl's had "recorded [the revised numbers] as a correction of an error during the current quarter." Kohl's also did not disclose the existence of any weaknesses in its disclosure or internal controls.

6. On June 28, 2011, Kohl's disclosed that it had secured an agreement for the provision of a $1 billion senior unsecured credit facility (the "Credit Agreement," cited herein as "Agr., §__"); the Credit Agreement required Defendants to confirm the accuracy of the Company's financial statements and condition. Just five weeks later, on August 4, 2011, Kohl's issued a press release in which it confirmed that it had "commenced a detailed review of its historical lease accounting with the goal of quantifying [the] errors" it had previously identified. Now, however, Kohl's represented

- 2 -

that the adjustments resulting from the lease accounting issues "may be spread over a number of years, and may be material to one or more years." In response, the Company's stock price declined by nearly 8% on heavy volume.

7. On August 11, 2011, Kohl's disclosed that the Audit Committee of its Board of Directors (the "Board"), in consultation with its management – *i.e.*, including Defendants Mansell and McDonald – and its auditor, Ernst & Young LLP ("E&Y"), had concluded that "investors should no longer rely upon the financial statements included in the Company's Annual Report on Form 10-K for the fiscal year ended January 29, 2011 . . . or the Company's Quarterly Report on Form 10-Q for the quarterly period ended April 30, 2011" or "any related reports" of E&Y. Although Kohl's confirmed it would issue restatements and file its second quarter Form 10-Q late, it reported second quarter results anyway. Thus, the impact of the errors (and restatements) remained concealed.

8. Subsequently, in a September 8, 2011 SEC filing, Kohl's provided guidance on the impact of the lease accounting errors and the forthcoming restatements, noting that: (i) adjustments would impact the classification of cash flows from operations/net income; (ii) additional property and capital lease and financing obligations would be recorded; and (iii) the presentation of lease payments would "significantly change." Kohl's also reiterated that it would file its second quarter Form 10-Q late. Despite having already reported second quarter results in August 2011, however, Kohl's disclosed that it could "not provide a reasonable estimate of its second quarter results beyond net sales" and other similar sales data. In response, the Company's stock price declined by nearly 2.5% that day, followed by a further price decline of nearly 2.9% the next day.

9. Finally, on September 13, 2011, Kohl's issued its restatements, which largely covered the first and second fiscal quarters of 2010 and 2011 (including the second quarter results issued on August 11, 2011) and fiscal years 2006 through 2010. The restated figures showed that Kohl's had

- 3 -

significantly understated its liabilities and debt (and other metrics) while overstating its equity (and other metrics). Additionally, due to the lease accounting issues and restatements, Defendants had to disclose the existence of material weaknesses in the Company's disclosure and internal controls and had to implement various corporate remedial measures. Kohl's could not confirm that these material weaknesses were remediated until August 2012.

10. Accordingly, as alleged herein, it was false and materially misleading for Defendants to: (i) issue financial statements that contained errors and were not prepared in conformity with GAAP; (ii) disseminate inaccurate financial information that had to be restated, including the Company's 2011 second quarter results; (iii) represent in November and December 2010 that the accounting errors were immaterial; (iv) certify that the Company's disclosure and internal controls were effective, while failing to disclose the existence of material weaknesses in the controls until well after acknowledging the lease accounting errors; and (v) represent in the Credit Agreement that the Company's financial statements were and would continue to be prepared in accord with GAAP.

11. Moreover, this was not the first time that the Company's lease accounting practices had been called into question, were found to have resulted in material inaccuracies, and required restatements over multiple years to ensure compliance with GAAP. In February 2005, Kohl's disclosed that it had reviewed its lease accounting practices and concluded they did not conform to GAAP, resulting in the Company's issuance of inaccurate financial statements. These inaccuracies required Kohl's to restate its financial results from fiscal year 1998 through the first three fiscal quarters of 2004. Thus, Defendants have been down this road before and had even scrutinized their accounting practices before issuing the most recent round of restatements, yet they supervised the Company's consistent preparation of inaccurate financial statements – spanning five years – anyway.

- 4 -

12.     As detailed below, Defendants were required to confirm the accuracy of the financial statements and information at issue, yet they failed to do so. They disregarded the accuracy of the financial statements and their representations in order to facilitate insider sales of nearly $50 million of Kohl's common stock.  That is securities fraud.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  By Memorandum Order dated October 8, 2013, the Honorable Jed S. Rakoff of the U.S. District Court for the Southern District of New York transferred the action to this Court "for the convenience of the parties and witnesses and in the interest of justice," finding that connections with this District "are substantial." Additionally, in connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities market.

## PARTIES

16.     Lead Plaintiff Pension Trust Fund for Operating Engineers, as set forth in the Certification submitted in connection with its motion for the appointment of lead plaintiff and lead counsel and incorporated by reference herein, purchased the common stock of Kohl's during the Class Period and has been damaged thereby.

- 5 -

17.     Plaintiff City of Sterling Heights Police & Fire Retirement System, as set forth in the Certification submitted in connection with the initial complaint and incorporated by reference herein, purchased the common stock of Kohl's during the Class Period and has been damaged thereby.

18.     Lead Plaintiff Pension Trust Fund for Operating Engineers and Plaintiff City of Sterling Heights Police & Fire Retirement System are collectively referred to herein as "Plaintiffs."

19.     Defendant Kohl's operates department stores across the U.S. that sell moderately priced apparel and home fashions that are targeted to middle-income consumers. At all relevant times, the Company's common stock traded publicly on the NYSE.

20.     Defendant Mansell has served as the Company's President and as a member of the Board since February 1999, CEO since August 2008, and Chairman of the Board since September 2009.

21.     Defendant McDonald has served as the Company's CFO since August 2003 and as Senior Executive Vice President since November 2010. From August 2003 through November 2010, he also served as the Company's Executive Vice President. He signed the Credit Agreement.

22.     Defendants Mansell and McDonald are referred to herein together as the "Individual Defendants."

23.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Kohl's, were privy to confidential and proprietary information concerning Kohl's, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Kohl's, as discussed below. Because of their positions with Kohl's, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other

- 6 -

corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24. The Individual Defendants are liable as direct participants in the wrongs alleged. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct alleged. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Kohl's business and its issuance of public statements.

25. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

26. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Kohl's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future

- 7 -

business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Kohl's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Kohl's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public about Kohl's business, operations and management and the intrinsic value of Kohl's common stock; (ii) allowed the Individual Defendants and certain Company insiders to collectively sell their personally held Kohl's common stock for proceeds in excess of $50 million; and (iii) caused Plaintiffs and members of the Class (defined below) to purchase Kohl's common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

28.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Kohl's between February 26, 2009 and September 13, 2011, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

29.    The members of the Class are so numerous that joinder is impracticable. Throughout the Class Period, Kohl's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Kohl's

or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

31.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

          (a)     whether the federal securities laws were violated by Defendants' conduct;

          (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Kohl's;

          (c)     whether the price of Kohl's common stock was artificially inflated during the Class Period; and

          (d)     whether and to what extent Plaintiffs and the other members of the Class have sustained damages, and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

- 9 -

## SUBSTANTIVE ALLEGATIONS

**Background of the Allegations**

34.     Defendant Kohl's operates family-oriented department stores that sell moderately priced apparel, footwear and accessories, as well as soft home products and housewares. Kohl's also operates a website that enables its customers to shop via the Internet.

35.     As of January 28, 2012, Kohl's operated 1,127 stores in 49 states. The Company's typical, or "prototype," store has approximately 88,000 gross square feet of retail space and serves trade areas of 150,000 to 200,000 people. The Company also operates "small" stores that are 55,000 to 68,000 square feet in size and serve trade areas of 100,000 to 150,000 people, and "urban" stores, currently located in the New York and Chicago markets, that serve very densely populated areas of up to 500,000 people and average approximately 125,000 gross square feet of retail space.

36.     Approximately 35% of the stores the Company operates are owned by Kohl's and the remaining 65% are leased. Kohl's typical lease has an initial term of 20-25 years and four to eight renewal options for consecutive five-year extension terms. Substantially all of the Company's leases provide for a minimum annual rent that is fixed or adjusts to set levels during the lease term, including renewals. Approximately one-fourth of the leases provide for additional rent based on a percentage of sales over designated levels.

37.     During the Class Period, Kohl's disclosed that it maintains two strategic committees that focus on opportunities to drive profitability: the Regional Assortment Committee, and the In-Store Experience Committee. The mission of the Regional Assortment Committee is to accelerate sales growth by varying the regional merchandise assortment, marketing and store presentation to reflect customer lifestyle preferences and climate needs. The mission of the In-Store Experience Committee is to deliver an improved store experience so as to generate customer loyalty and grow market share.

38.     During the Class Period, Defendants represented that Kohl's "in-store shopping experience initiative" was one of several initiatives designed to achieve the goals of its strategic committees.  In this regard, Kohl's SEC filings note that store remodeling is "an important part of our in-store shopping experience initiative" and that it completed 100, 85 and 51 store remodels in 2011, 2010 and 2009, respectively.

39.     In addition, the Company noted that its new and remodeled stores reflect its latest thoughts in store design, with its most recent enhancements including new and updated exteriors, point-of-sale stations, fitting rooms, lounges, restrooms and customer service areas; specialty fixturing, junior's, kids, young men's and shoe departments; and its store center cores, to improve customer sightlines.

40.     As noted, after the end of its October 30, 2010 quarter, the Company represented that it had identified various errors in accounting for its leased properties and that it had completed a detailed review of each of its leases.  Kohl's disclosed that these errors occurred over a number of years and primarily resulted from: (i) erroneously estimating the possession date in determining the commencement of the lease terms; (ii) improperly accounting for and reporting of certain asset depreciation; and (iii) improperly accounting for and reporting of landlord reimbursements of construction-related costs.

41.     Kohl's also reported that "corrections [of the above-noted errors] were not material to [its] previously reported financial statements, so they have been recorded as a correction of an error during the current quarter."  In truth, however, Kohl's accounting for and reporting of its leases was materially misstated.  Kohl's improper lease accounting during the Class Period caused its reported liabilities and debt to be materially understated and its reported equity to be materially overstated.

- 11 -

42.     Defendants consciously misrepresented or recklessly disregarded Kohl's improper lease accounting practices for the purpose of facilitating insider sales of more than $50 million of Kohl's common stock.

**Materially False and Misleading Statements**
**Issued During the Class Period**

43.     The Class Period begins on February 26, 2009.  On that date, Kohl's announced its earnings for its 2008 fourth quarter and year-end, the periods ended January 31, 2009.  For the quarter and year-end, the Company reported net income of $336 million, or $1.10 per diluted share, and $885 million, or $2.89 per diluted share, respectively.  In addition, Kohl's reported that its reported long-term debt and capital leases (including current portion) totaled $2.070 billion at January 31, 2009.

44.     On March 20, 2009, Kohl's filed with the SEC its Form 10-K for the year ended January 31, 2009 (the "2008 Form 10-K"), which was signed by Defendants Mansell and McDonald, and represented, in part, that the Company' financial statements for the year ended January 31, 2009 were prepared and presented in conformity with GAAP.

45.     The 2008 Form 10-K also included, in pertinent part, the following representations about the Company's disclosure and internal controls and Defendants Mansell's and McDonald's certifications, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), thereon:

*(a)     Evaluation of Disclosure Controls and Procedures*

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (the "Evaluation") at a reasonable assurance level as of the last day of the period covered by this Report.

Based upon the Evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective at the

reasonable assurance level. Disclosure controls and procedures are defined by Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934 (the "Exchange Act") as controls and other procedures that are designed to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

It should be noted that the design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving our stated goals under all potential future conditions, regardless of how remote.

*(b)* *Management's Annual Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control system was designed to provide reasonable assurance to our management and Board of Directors regarding the preparation and fair presentation of our published financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

Our management assessed the effectiveness of our internal control over financial reporting as of January 31, 2009. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control - Integrated Framework*. Based on our assessment, management believes that, as of January 31, 2009, our internal control over financial reporting is effective based on those criteria.

\* \* \*

I, [Defendants Mansell/McDonald], certify that:

1. I have reviewed this Annual Report on Form 10-K of Kohl's Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

- 13 -

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

- 14 -

46. The above representations about the Company's internal and disclosure controls, and Defendants Mansell's and McDonald's certifications thereon, were repeated, in all material respects, in the Forms 10-K that Kohl's filed with the SEC during the remainder of the Class Period. Further, representations about the Company's internal and disclosure controls in the certifications included in the Forms 10-K were made in Defendants Mansell's and McDonald's Sarbanes-Oxley certifications included in the Company's Forms 10-Q throughout the Class Period, consisting of the Forms 10-Q filed with the SEC on June 5, 2009, September 4, 2009, December 4, 2009, June 4, 2010, September 3, 2010, December 9, 2010, and June 1, 2011.

47. On May 14, 2009, Kohl's announced its earnings for its 2009 first quarter, the period ended May 2, 2009. For the quarter, the Company reported net income of $137 million, or $.45 per diluted share. In addition, Kohl's reported that its reported long-term debt and capital leases (including current portion) totaled $2.073 billion at May 2, 2009.

48. On June 5, 2009, Kohl's filed with the SEC its Form 10-Q for the first quarter ended May 2, 2009 (the "2009 Q1 Form 10-Q"), which was signed by Defendants Mansell and McDonald. The 2009 Q1 Form 10-Q included: (i) Kohl's financial statements for the quarter ended May 2, 2009, which were represented to have been prepared and presented in conformity with GAAP; (ii) representations about the Company's internal and disclosure controls; and (iii) Defendants Mansell's and McDonald's Sarbanes-Oxley certifications. The 2009 Q1 Form 10-Q stated, in pertinent part:

> The accompanying financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for fiscal year end financial statements. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included. For further information, refer to the financial statements and related footnotes included in our Form 10-K (Commission File No. 1-11084) filed with the Securities and Exchange Commission.

- 15 -

49.     Additionally, as indicated above, Defendants Mansell's and McDonald's Sarbanes-Oxley certifications contained representations regarding the Company's disclosure and internal controls, including the adequacy and efficacy of those controls and their personal evaluation of such controls to ensure that the controls were adequate and effective.

50.     For example, in the 2009 Q1 Form 10-Q, Defendants Mansell and McDonald made the following representations in their certifications concerning the Company's disclosure and internal controls:

I, [Defendants Mansell/McDonald], certify that:

1.     I have reviewed this quarterly report on Form 10-Q of Kohl's Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

- 16 -

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

51.     Defendants Mansell and McDonald made the same or similar representations about the Company's disclosure and internal controls in the other Forms 10-Q that the Company filed during the Class Period.

52.     On August 13, 2009, Kohl's announced its earnings for its 2009 second quarter, the period ended August 1, 2009. For the quarter, the Company reported net income of $229 million, or $.75 per diluted share. In addition, Kohl's reported that its long-term debt and capital leases (including current portion) totaled $2.069 billion at August 1, 2009.

53.     On September 4, 2009, Kohl's filed with the SEC its Form 10-Q for the quarter ended August 1, 2009 (the "2009 Q2 Form 10-Q"), which was signed by Defendants Mansell and McDonald. The 2009 Q2 Form 10-Q included: (i) Kohl's financial statements for the quarter ended August 1, 2009, which were represented to have been prepared and presented in conformity with

- 17 -

GAAP; (ii) representations about the Company's internal and disclosure controls; and (iii) Defendants Mansell's and McDonald's Sarbanes-Oxley certifications. The 2009 Q2 Form 10-Q stated, in pertinent part:

> The accompanying financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for fiscal year end financial statements. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included. For further information, refer to the financial statements and related footnotes included in our Form 10-K (Commission File No. 1-11084) filed with the Securities and Exchange Commission.

54. Additionally, as indicated above, Defendants Mansell's and McDonald's Sarbanes-Oxley certifications contained representations regarding the Company's disclosure and internal controls, including the adequacy and efficacy of those controls and their personal evaluation of such controls to ensure that the controls were adequate and effective.

55. On November 12, 2009, Kohl's announced its earnings for its 2009 third quarter, the period ended October 31, 2009. For the quarter, the Company reported net income of $193 million, or $.63 per diluted share. In addition, Kohl's reported that its long-term debt and capital leases (including current portion) totaled $2.071 billion at October 31, 2009.

56. On December 4, 2009, Kohl's filed with the SEC its Form 10-Q for the quarter ended October 31, 2009 (the "2009 Q3 Form 10-Q"), which was signed by Defendants Mansell and McDonald. The 2009 Q3 Form 10-Q included: (i) Kohl's financial statements for the quarter ended October 31, 2009, which were represented to have been prepared and presented in conformity with GAAP; (ii) representations about the Company's internal and disclosure controls; and (iii) Defendants Mansell's and McDonald's Sarbanes-Oxley certifications. The 2009 Q3 Form 10-Q stated, in pertinent part:

The accompanying financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for fiscal year end financial statements. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included. For further information, refer to the financial statements and related footnotes included in our Form 10-K (Commission File No. 1-11084) filed with the Securities and Exchange Commission.

57. Additionally, as indicated above, Defendants Mansell's and McDonald's Sarbanes-Oxley certifications contained representations regarding the Company's disclosure and internal controls, including the adequacy and efficacy of those controls and their personal evaluation of such controls to ensure that the controls were adequate and effective.

58. On February 25, 2010, Kohl's announced its earnings for its 2009 fourth quarter and year end, the periods ended January 30, 2010. For the quarter and year end, the Company reported net income of $431 million, or $1.40 per diluted share, and $991 million, or $3.23 per diluted share, respectively. In addition, Kohl's reported that its reported long-term debt and capital leases (including current portion) totaled $2.068 billion at January 30, 2010.

59. On March 19, 2010, Kohl's filed with the SEC its Form 10-K for the year ended January 30, 2010 (the "2009 Form 10-K"), which was signed by Defendants Mansell and McDonald. The 2009 Form 10-K included: (i) Kohl's financial statements for the years ended January 30, 2010 and January 31, 2009, which were represented to have been prepared and presented in conformity with GAAP; (ii) representations about the Company's internal and disclosure controls; and (iii) Defendants Mansell's and McDonald's Sarbanes-Oxley certifications. As indicated above, Defendants Mansell's and McDonald's Sarbanes-Oxley certifications contained representations regarding the Company's disclosure and internal controls, including the adequacy and efficacy of those controls and their personal evaluation of such controls to ensure that the controls were adequate and effective.

- 19 -

60.     On May 13, 2010, Kohl's announced its earnings for its 2010 first quarter, the period ended May 1, 2010.  For the quarter, the Company reported net income of $199 million, or $.64 per diluted share.  In addition, Kohl's reported that its long-term debt and capital leases (including current portion) totaled $2.072 billion at May 1, 2010.

61.     On June 4, 2010, Kohl's filed with the SEC its Form 10-Q for the quarter ended May 1, 2010 (the "2010 Q1 Form 10-Q"), which was signed by Defendant McDonald.  The 2010 Q1 Form 10-Q included: (i) Kohl's financial statements for the quarter ended May 1, 2010, which were represented to have been prepared and presented in conformity with GAAP; (ii) representations about the Company's internal and disclosure controls; and (iii) Defendants Mansell's and McDonald's Sarbanes-Oxley certifications.  The 2010 Q1 Form 10-Q stated, in pertinent part:

> The accompanying financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information.  Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for fiscal year end financial statements.  In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.  For further information, refer to the financial statements and related footnotes included in our Form 10-K (Commission File No. 1-11084) filed with the Securities and Exchange Commission.

62.     Additionally, as indicated above, Defendants Mansell's and McDonald's Sarbanes-Oxley certifications contained representations regarding the Company's disclosure and internal controls, including the adequacy and efficacy of those controls and their personal evaluation of such controls to ensure that the controls were adequate and effective.

63.     On August 12, 2010, Kohl's announced its earnings for its 2010 second quarter, the period ended July 31, 2010.  For the quarter, the Company reported net income of $260 million, or $.84 per diluted share.  In addition, Kohl's reported that its long-term debt and capital leases (including current portion) totaled $2.085 billion at July 31, 2010.

- 20 -

64. On September 3, 2010, Kohl's filed with the SEC its Form 10-Q for the quarter ended July 31, 2010 (the "2010 Q2 Form 10-Q"), which was signed by Defendant McDonald. The 2010 Q2 Form 10-Q included: (i) Kohl's financial statements for the quarter ended July 31, 2010, which were represented to have been prepared and presented in conformity with GAAP; (ii) representations about the Company's internal and disclosure controls; and (iii) Defendants Mansell's and McDonald's Sarbanes-Oxley certifications. The 2010 Q2 Form 10-Q stated, in pertinent part:

> The accompanying financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for fiscal year end financial statements. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included. For further information, refer to the financial statements and related footnotes included in our Form 10-K (Commission File No. 1-11084) filed with the Securities and Exchange Commission.

65. Additionally, as indicated above, Defendants Mansell's and McDonald's Sarbanes-Oxley certifications contained representations regarding the Company's disclosure and internal controls, including the adequacy and efficacy of those controls and their personal evaluation of such controls to ensure that the controls were adequate and effective.

66. On November 4, 2010, Kohl's announced its total sales for the month ended October 30, 2010 and disclosed third quarter earnings guidance per diluted share of $.57 to $.58, at the low end of the guidance it had previously provided to the market. The Company also disclosed that it had undertaken a "detailed review of its historical accounting" and that its guidance incorporated corrections resulting from that review, but that the corrections were not material to its previously reported financial statements. The Company stated, in pertinent part:

> The Company expects third quarter earnings per diluted share of $0.57 to $0.58, consistent with the low end of its previous guidance of $0.57 - $0.63 per diluted share. Included in this guidance is an accounting correction resulting from recently identified errors in the Company's accounting for leased properties. As a result of a detailed review of its historical accounting, the Company expects to record

- 21 -

adjustments to depreciation, interest and rent expense during the third quarter. Though the Company has not completed its review, it currently expects a correction of up to $25 million, or $0.05 per diluted share. The errors occurred over a number of years and are not material to any previously reported period.

67.     The representation that the errors were "not material to any previously reported period," notwithstanding the fact that they had "occurred over a number of years," was false and misleading because Defendants knew or should have known the scope of the errors and the figures that had to be restated.  Moreover, Defendants had previously engaged in a detailed review of the Company's lease accounting practices several years earlier, which also resulted in restatements. Accordingly, Defendants had extensively evaluated the Company's lease accounting practices by the time they announced these errors.

68.     On November 10, 2010, Kohl's announced its earnings for its 2010 third quarter, the period ended October 30, 2010.  For the quarter, the Company reported net income of $194 million, or $.63 per diluted share.  In addition, Kohl's reported that its long-term debt and capital leases (including current portion) totaled $2.085 billion at October 30, 2010.

69.     The Company announced that its reported results excluded certain "corrections" related to its accounting for leased properties, which resulted from "a detailed review of its historical accounting for leased properties," and that it intended to complete its review prior to the filing of its 2010 third quarter Form 10-Q.  The Company stated, in pertinent part:

> As previously disclosed, as a result of a detailed review of its historical accounting for its leased properties, the Company expects to record non-cash adjustments which are expected to increase depreciation, interest and rent expense for the third quarter. Though the Company has not completed its review, based largely on the average adjustment required for leases that have been reviewed to date, management currently expects a correction in the range of $25 million, or $0.05 per diluted share, to $75 million, or $0.15 per diluted share. The errors occurred over a number of years. Upon finalization of its review, the Company will quantify the impact of the corrections on previously reported periods.The Company expects the accounting review to be complete before filing its third quarter 10-Q.

- 22 -

70.     Additionally, the Company presented financial information for the third fiscal quarter of 2010 "subject to reclassification" and "before adjustments for lease accounting corrections." Thus, when Defendants announced the Company's third quarter financial results, they knew that the results could or would materially change when taking into account the lease accounting corrections they had identified.  It was materially misleading for Defendants to publicly disseminate financial results they knew were subject to change, not only because Defendants knew or should have known by then which figures would change, but also because investors were unaware of which financial figures would change or the magnitude of such changes.

71.     On December 2, 2010, Kohl's announced information regarding its total sales for the month ended November 27, 2010 and reiterated that it had undertaken a "detailed review of its historical accounting for leased properties" and intended to make certain "corrections" to its financial information.  However, the Company represented that the corrections were not material to its previously reported financial statements, stating, in pertinent part:

> The Company has substantially completed the detailed review of its historical accounting for leased properties as discussed in its November 10, 2010 press release. The Company expects the final adjustment to decrease third quarter income before taxes by approximately $50 million and diluted earnings per share by approximately $0.10, which is within the range of management's previous estimate of $25 million, or $0.05 per diluted share, to $75 million, or $0.15 per diluted share. Additionally, the Company has determined that the corrections are not material to any previously reported period.

72.     The representation that the errors were "not material to any previously reported period," despite the fact that they had occurred over a number of years, was false and misleading because Defendants knew or should have known by then the scope and magnitude of the errors and the figures that had to be restated.  Moreover, Defendants had engaged in a detailed review of the Company's lease accounting practices several years earlier, which also resulted in restatements.

Accordingly, Defendants had extensively evaluated the Company's lease accounting practices by the time they announced these errors.

73.    On December 9, 2010, Kohl's filed with the SEC its Form 10-Q for the quarter ended October 30, 2010 (the "2010 Q3 Form 10-Q"), which was signed by Defendant McDonald. The 2010 Q3 Form 10-Q included: (i) Kohl's financial statements for the quarter ended October 30, 2010, which were represented to have been prepared and presented in conformity with GAAP; (ii) representations about the Company's internal and disclosure controls; and (iii) Defendants Mansell's and McDonald's Sarbanes-Oxley certifications. The 2010 Q3 Form 10-Q stated, in pertinent part:

>    The accompanying financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for fiscal year end financial statements. In the opinion of management, all adjustments (consisting of normal recurring accruals . . .) considered necessary for a fair presentation have been included. For further information, refer to the financial statements and related footnotes included in our Form 10-K (Commission File No. 1-11084) filed with the Securities and Exchange Commission.

74.    Additionally, as indicated above, Defendants Mansell's and McDonald's Sarbanes-Oxley certifications contained representations regarding the Company's disclosure and internal controls, including the adequacy and efficacy of those controls and their personal evaluation of such controls to ensure that the controls were adequate and effective.

75.    The representations in the 2010 Q3 Form 10-Q that the financial statements were "prepared in accordance with [GAAP]" and that "all adjustments . . . considered necessary for a fair presentation have been included" in the financial statements were false and materially misleading when made, because the financial statements were not, in fact, prepared in accordance with GAAP and did not include all adjustments necessary for a fair presentation. Moreover, the representations made in Defendants Mansell's and McDonald's Sarbanes-Oxley certifications as to the adequacy

- 24 -

and efficacy of the Company's disclosure and internal controls, and the accuracy of the Company's financial reporting practices, were false and misleading because of the lease accounting errors.

76.     In addition, the 2010 Q3 Form 10-Q disclosed that Defendants had identified various errors, occurring over a number of years, related to the Company's accounting for leased properties. Defendants also represented that Kohl's had completed a detailed review of each its leases and that the errors, which Defendants represented were not material to the Company's previously reported financial statements, resulted primarily from the following, stating, in pertinent part:

- In accordance with generally accepted accounting principles, we recognize rent expense on a straight-line basis over the expected term of the lease, including cancelable option periods where failure to exercise such options would result in an economic penalty. The lease term begins on the earlier of the date we become legally obligated for the rent payments and the date we take possession of the property. Historically, we had used an estimated possession date in determining the commencement of the lease term. As a result of our review, we have determined that in many cases the lease term began prior to the previously estimated possession date.

- For various leases, certain assets were being depreciated over a period which was not consistent with the straight-line rent period (for operating leases) or the capital lease obligation period (for capital leases).

- Pursuant to our lease agreements, our landlords often reimburse us for construction-related costs. These reimbursements typically are less than the total costs we incur, but may also exceed such costs. Historically, we had incorrectly recorded the net of the costs and the reimbursements in Property and Equipment in our Condensed Consolidated Balance Sheets. These activities should have been classified as prepaid rent within Other Long-Term Assets (when cost exceeds reimbursement) or as rent incentives within Other Long-Term Liabilities (when reimbursement exceeds cost) in our Condensed Consolidated Balance Sheets.

These corrections were not material to our previously reported financial statements, so they have been recorded as a correction of an error during the current quarter. The impacts of the required corrections to the various line items of our financial statements as of and for the periods ended October 30, 2010 are detailed in the table below:

|  | Increase (Decrease) (In Millions, Except per Share Data) |
|---|---|
| **Balance Sheet** | |
| Property and equipment, net | $ 38 |
| Other assets (current and long-term) | 48 |
| Capital lease obligations (current and long-term) | 13 |
| Deferred income tax liability | (19) |
| Other liabilities (current and long-term) | 122 |
| | |
| **Statements of Income** | |
| Selling, general and administrative expenses | $ 16 |
| Depreciation and amortization | 25 |
| Operating income | (41) |
| Interest expense, net | 7 |
| Income before income taxes | (48) |
| Provision for income taxes | (17) |
| Net income | (31) |
| | |
| **Net income per share:** | |
| Basic | $ (0.10) |
| Diluted | (0.10) |
| | |
| **Statement of Cash Flows** | |
| Net cash provided by operating activities | $ (9) |
| Acquisition of property and equipment/Net cash used in investing activities | (9) |

77.     In response to this announcement, the price of Kohl's common stock declined by approximately 1%, closing at $53.64 per share, on December 10, 2010.

78.     On February 24, 2011, Kohl's announced its earnings for its 2010 fourth quarter and year-end, the periods ended January 29, 2011. For the quarter and year end, the Company reported net income of $493 million, or $1.66 per diluted share, and $1.1 billion, or $3.65 per diluted share, respectively. In addition, Kohl's reported that its reported long-term debt and capital leases (including current portion) totaled $2.096 billion at January 29, 2011.

79.     On March 18, 2011, Kohl's filed with the SEC its Form 10-K for the year ended January 29, 2011 (the "2010 Form 10-K"), which was signed by Defendants Mansell and McDonald. The 2010 Form 10-K included: (i) Kohl's financial statements for the years ended January 29, 2011,

- 26 -

January 30, 2010 and January 31, 2009, which were represented to have been prepared and presented in conformity with GAAP; (ii) representations about the Company's internal and disclosure controls; and (iii) Defendants Mansell's and McDonald's Sarbanes-Oxley certifications.

80. The representation in the 2010 Form 10-K that the financial statements were prepared in accordance with GAAP was false and materially misleading when made, because the financial statements were not, in fact, prepared in accordance with GAAP and did not include all adjustments necessary for a fair presentation. Moreover, the representations made in Defendants Mansell's and McDonald's Sarbanes-Oxley certifications as to the adequacy and efficacy of the Company's disclosure and internal controls, and the accuracy of the Company's financial reporting practices, were false and misleading because of the lease accounting errors.

81. On May 12, 2011, Kohl's announced its earnings for its 2011 first quarter, the period ended April 30, 2011. For the quarter, the Company reported net income of $211 million, or $.73 per diluted share. In addition, Kohl's reported that its long-term debt and capital leases (including current portion) totaled $1.783 billion at April 30, 2011.

82. On June 1, 2011, Kohl's filed with the SEC its Form 10-Q for the quarter ended April 30, 2011 (the "2011 Q1 Form 10-Q"), which was signed by Defendant McDonald. The 2011 Q1 Form 10-Q included Kohl's financial statements for the quarter ended April 30, 2011, which were represented to have been presented in conformity with GAAP, representations about the Company's internal and disclosure controls, and Defendants Mansell's and McDonald's certifications thereon, and stated, in pertinent part:

> The accompanying financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for fiscal year end financial statements. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been

- 27 -

included.  For further information, refer to the financial statements and related footnotes included in our Form 10-K (Commission File No. 1-11084) filed with the Securities and Exchange Commission.

83.     Additionally, as indicated above, the 2011 Q1 Form 10-Q included Defendants Mansell's and McDonald's Sarbanes-Oxley certifications regarding the Company's disclosure and internal controls, including the adequacy and efficacy of those controls and their personal evaluation of such controls to ensure that the controls were adequate and effective.

84.     The representation in the 2011 Q1 Form 10-Q that the financial statements were prepared in accordance with GAAP was false and materially misleading when made, because the financial statements were not, in fact, prepared in accordance with GAAP and did not include all adjustments necessary for a fair presentation.  Moreover, the representations made in Defendants Mansell's and McDonald's Sarbanes-Oxley certifications as to the adequacy and efficacy of the Company's disclosure and internal controls, and the accuracy of the Company's financial reporting practices, were false and misleading because of the lease accounting errors.

85.     The 2011 Q1 Form 10-Q also included disclosures about the Company's financing activities, stating, in pertinent part:

> We repaid $300 million of long-term debt which was due in March 2011.  An additional $100 million of long-term debt will be due in October 2011.  We expect to replace this debt with new debt financing in the third quarter of 2011.  In anticipation of this debt issuance, we entered into 10-year interest rate swaps in December 2010 and May 2011 to hedge our exposure to the risk of increases in interest rates on $400 million of debt we expect to issue.  Amounts related to these financial instruments were not material.
>
> We have various facilities upon which we may draw funds, including a $900 million senior unsecured revolving facility and two demand notes with aggregate availability of $50 million.  The $900 million revolving facility expires in October 2011.  The co-leads of this facility, The Bank of New York Mellon and Bank of America, have each committed $100 million.  The remaining 12 lenders have each committed between $30 and $130 million.  There were no draws on these facilities during 2011 or 2010.  We expect to replace the $900 million revolving facility in the second quarter of 2011.

- 28 -

86. On June 28, 2011, Kohl's filed a Form 8-K with the SEC announcing that it had entered into the Credit Agreement, which Defendant McDonald signed as CFO, pursuant to which various lenders agreed to extend to Kohl's a $1.0 billion senior unsecured five-year revolving credit facility. As alleged further below, the Credit Agreement included representations and warranties by Defendants that Kohl's would provide accurate financial statements prepared in accordance with GAAP, and imposed affirmative covenants on Defendants to provide such financial statements and certify as to the Company's total indebtedness. As further alleged herein, these representations, warranties and covenants required Defendants to familiarize themselves with and know about the Company's financial condition and the accuracy of its financial statements.

87. The statements in the Credit Agreement concerning these representations, warranties and covenants, in which Defendants confirmed that the Company's financial statements were and would continue to be prepared and presented in accordance with GAAP, were false and materially misleading because of the lease accounting errors and the fact that the financial statements were not prepared or presented in accordance with GAAP.

88. On August 4, 2011, Kohl's issued a press release disclosing, among other things, that it had identified certain errors in accounting for its leases. This time, however, Kohl's indicated that the financial adjustments necessitated by the errors "may be spread over a number of years, and may be material to one or more years." The press release stated, in part:

> The Company has commenced a detailed review of its historical lease accounting with the goal of quantifying the impact of these errors for each affected reporting period. As of the date of this release, the Company expects to record non-cash adjustments to depreciation, interest and rent expenses as well as to its fixed assets and liabilities during the second quarter. These adjustments may be spread over a number of years, and may be material to one or more years. The Company and its independent accounting firm, Ernst & Young, LLP, expect to complete their accounting review prior to filing the Company's Quarterly Report on Form 10-Q for the second fiscal quarter.

- 29 -

89.     In response to this announcement, the price of Kohl's common stock declined by nearly 8% to close at $47.67 per share on August 4, 2011, on extremely heavy volume of nearly 10.9 million shares.  Notwithstanding the market's reaction, the truth concerning the nature and extent of the lease accounting errors, the magnitude and impact of such errors, and the existence of material weaknesses in the Company's disclosure and internal controls, remained at least partially concealed.

90.     On August 11, 2011, Kohl's issued a press release announcing its earnings for its 2011 second quarter, the period ended July 30, 2011.  For the quarter, the Company reported net income of $303 million, or $1.09 per diluted share.  Additionally, Kohl's disclosed various other information concerning its second quarter and year-to-date financial performance, it cautioned that investors should not rely on its prior financial statements, and it described the "corrections" to its financial information – required as a result of the lease accounting inaccuracies – as follows:

> On August 4, 2011, Kohl's reported that it had identified certain errors related to its accounting for leases. On August 9, 2011, the audit committee of Kohl's board of directors, in consultation with management, concluded that because of these errors, investors should no longer rely upon the financial statements included in the Company's Annual Report on Form 10-K for the fiscal year ended January 29, 2011 or its Quarterly Report on Form 10-Q for the period ended April 30, 2011. In addition, any related reports of the Company's independent registered public accounting firm (Ernst & Young LLP) should not be relied upon.

> To correct the accounting errors, Kohl's will record additional property and related financing obligations on its Balance Sheet. In its Statements of Income, Kohl's will now recognize lease payments as depreciation and interest expense, rather than rent expense (which were previously recorded in Selling, General and Administrative Expense). The corrections will have no impact on the net increase or decrease in cash and cash equivalents reported in Kohl's Statements of Cash Flows.

> Kohl's management, in conjunction with Ernst & Young LLP, is still in the process of completing a review of its historic lease accounting and is currently unable to provide reasonable estimates of the impact by reporting period and/or financial statement line item.

                    *        *        *

- 30 -

The actual results and earnings guidance included above do not include any impact from these lease accounting corrections.

91. It was materially misleading for Defendants to issue financial information they knew would change. Underscoring the unreliability of the financial information contained in the August 11, 2011 press release, Kohl's disclosed that "second quarter and year-to-date results are preliminary to the extent that they do not reflect the impact of any of the lease accounting corrections described [therein]," and the Condensed Consolidated Statements of Income for the three-and-six-month periods ended July 31, 2010 indicated that the information contained therein was disclosed "subject to reclassification" and "before adjustments for lease accounting corrections." Without additional information concerning the adjustments and the identification of which information was subject to change, investors could not differentiate between reliable and unreliable information. By contrast, Defendants knew or should have known which information would be restated, but they issued the inaccurate second quarter results anyway.

92. Also on August 11, 2011, Kohl's filed a Form 8-K with the SEC attaching its earnings press release and Condensed Consolidated Statements of Income and reiterating that, as a result of errors related to its accounting for leases, investors should no longer rely upon the financial statements included in the Company's 2010 Form 10-K and 2011 Q1 Form 10-Q. The Form 8-K stated, in pertinent part:

> As reported by the Company in its current report on Form 8-K furnished to the Commission on August 4, 2011, the Company has identified certain errors related to its accounting for leases. On August 9, 2011, the audit committee of the Company's board of directors, in consultation with management, concluded that because of these errors, investors should no longer rely upon the financial statements included in the Company's Annual Report on Form 10-K for the fiscal year ended January 29, 2011 (the "2010 Annual Report") or the Company's Quarterly Report on Form 10-Q for the quarterly period ended April 30, 2011 (the "1st Quarter 10-Q"). In addition, any related reports of the Company's independent registered public accounting firm (Ernst & Young LLP) should not be relied upon.

- 31 -

The Company has discovered various errors in its accounting for both store and equipment leases. The most significant errors are the result of misinterpretations of accounting literature related to leases where the lessee (the Company in this case) is involved in asset construction. Historically, the Company has been extensively involved in the construction of leased stores. In many cases, the Company is responsible for construction cost over runs or is responsible for non-standard tenant improvements (i.e. roof or HVAC systems). Pursuant to ASC 840, *Leases*, the Company is deemed the "owner" for accounting purposes during the construction period, so is required to capitalize the construction costs on its Balance Sheet. If a portion of the construction costs are reimbursed via adjusted rental payments rather than at the time of construction or if the property is subject to a lease which fixes the rents for a significant percentage of its economic life, the Company is precluded from derecognizing the constructed assets from its Balance Sheet when construction is complete.

Additionally, certain stores and equipment leases were improperly recorded as operating leases, rather than capital leases.

As a result of these and other less significant accounting corrections, the Company will record additional property and financing obligations on its Balance Sheet. In the Company's Statements of Income, lease payments will be recognized as depreciation and interest expense, rather than rent expense (which the Company records in Selling, General and Administrative Expense). The corrections will have no impact on the net increase or decrease in cash and cash equivalents reported in the Company's Statements of Cash Flows.

The Company, in conjunction with Ernst & Young LLP, is still in the process of completing a review of its historic lease accounting and is currently unable to provide reasonable estimates of the impact by reporting period and/or financial statement line item.

In conjunction with Ernst & Young LLP, the Company is working diligently to complete the restatement of the above-referenced financial statements. The Company expects to file its Quarterly Report on Form 10-Q for the quarter ended July 30, 2011 (the "2nd Quarter 10-Q") and the restated 2010 Annual Report and 1st Quarter 10-Q, by no later than September 13, 2011, the expiration date of the extension period provided by Rule 12b-25 of the Securities Exchange Act of 1934, as amended. However, there can be no assurance that these filings will be made within this period.

Management has considered, and is continuing to evaluate, the effect of the facts leading to the restatement on the Company's prior conclusions of the adequacy of its internal control over financial reporting and disclosure controls and procedures as of the end of each of the applicable restatement periods. A final conclusion with respect to the effectiveness of the Company's internal controls over financial reporting and disclosure controls and procedures has not been made, but management currently expects to conclude that one or more material weaknesses in such controls

- 32 -

and procedures was present during each of the applicable restatement periods. The Company will amend any disclosures pertaining to its evaluation of such controls and procedures as appropriate in connection with future filings.

93.     Also on August 11, 2011, after issuing the press release and filing the Form 8-K discussed above, Kohl's held a conference call with investors and analysts to discuss the Company's second quarter financial results. Defendants Mansell and McDonald participated in the call, making introductory remarks and answering analyst questions.

94.     During the call, Defendant McDonald indicated that the lease accounting issues arose as a result of "several leasing strategies" that the Company employed, whereby Kohl's elects to substantially improve leased properties. Defendant McDonald stated, in pertinent part:

> Thanks, Kevin. In conjunction with our July sales release, we reported that we had identified certain areas related to our accounting for leases. Earlier this week, our audit committee concluded that because of these errors, investors should not rely on our 2010 Form 10-K or our first-quarter 10-Q. The most significant corrections relate to some very technical accounting literature related to our involvement in new store construction. It is important to note that all the corrections are non-cash.
>
> In reviewing our leases with our auditors, we have determined that many of our strategies in negotiating leases and in renovating and constructing stores have put us in a position of holding an ongoing financial interest or in having control of the building. We have had several leasing strategies that have caused the accounting issues. First, situations where we construct the building for the landlord, but receive a portion of the reimbursement through reduced rent over the term of the lease rather than upfront when we incur the construction costs.
>
> Second, our leases generally have renewal options at fixed rates, which cover substantially all of the building's economic life. And finally, we often make improvements that are more significant than normal tenant improvements -- replacing a roof or installing an HVAC system as examples.
>
> These strategies do not change the legal ownership of the store, but do require us to record the property and corresponding liability on our books. The corrections will also recategorize rent expense as depreciation and interest expense. We are working diligently to quantify the impact of these errors on both our historical and our prospective results and currently plan to file our restated 10-K and first-quarter 10-Q, as well as our second-quarter 10-Q by September 13, which is the normal due date plus a five-day extension as allowed by the SEC.

- 33 -

95.     Additionally, Defendant McDonald walked through the Company's second quarter financial results (as reported earlier that day), despite the fact that they would be restated one month later.  For example, he referenced quarterly depreciation expense (represented as $163 million, later restated to $190 million), quarterly operating income (represented as $510 million, later restated to $547 million), quarterly net interest expense (represented as $27 million, later restated to $72 million), and year-to-date net income (represented as $514 million, later restated to $500 million for the six months ended July 30, 2011).

96.     Further, Defendant McDonald again expressed the Company's guidance, indicating that it was subject to, and did not include any impact from, the lease accounting errors.  In fact, Kohl's prefaced the call with the following statement, which failed to adequately warn investors which financial figures discussed were reliable and which were not:

> Unless specifically noted, the historical results and the guidance that the Company is about to discuss do not include any adjustments that may result from the lease accounting corrections that the Company disclosed in its earnings release and related 8-K earlier today.

97.     Defendants' conscious or reckless disregard of the accuracy of their statements and the financial information they issued to the market is substantiated by the fact that they discussed not only historical financial information they knew would remain largely the same (such as quarterly sales and margins), but also other financial metrics – such as those impacted by the lease accounting errors – which they knew were likely to change and thus were unreliable.  By August 11, 2011, Defendants knew or should have known which metrics were likely to materially change in the forthcoming restatements as a result of the lease accounting errors, because Kohl's had engaged in an extensive investigation of its lease accounting practices and had to have known which metrics were more subject to change than others.  Thus, Defendants again disseminated financial information to the market in conscious or reckless disregard of its accuracy, because the forthcoming

- 34 -

restatements could – and likely would (and, in some cases, ultimately did) – materially alter certain aspects of the information that Defendants had disclosed.

98.     On September 8, 2011, Kohl's filed a notification of late filing with the SEC on Form 12b-25 disclosing that the Company was unable to file its Form 10-Q for the second quarter ended July 30, 2011 (the "2011 Q2 Form 10-Q") due to various errors in its accounting for both store and equipment leases, and stating, in pertinent part:

As reported by the Company in its current reports on Form 8-K furnished to the Commission on August 4, 2011 and August 11, 2011, the Company has identified certain errors related to its accounting for leases. On August 9, 2011, the audit committee of the Company's board of directors, in consultation with management, concluded that because of these errors, investors should no longer rely upon the financial statements included in the Company's Annual Report on Form 10-K for the fiscal year ended January 29, 2011 (the "2010 Annual Report") or the Company's Quarterly Report on Form 10-Q for the quarterly period ended April 30, 2011 (the "First Quarter 10-Q"). The Company has further advised that any related reports of the Company's independent registered public accounting firm (Ernst & Young LLP) should not be relied upon.

The Company has discovered various errors in its accounting for both store and equipment leases. The most significant errors are the result of misinterpretations of accounting literature related to leases where the lessee (the Company in this case) is involved in asset construction. Historically, the Company has been extensively involved in the construction of leased stores. In many cases, the Company is responsible for construction cost over runs or is responsible for non-standard tenant improvements (i.e. roof or HVAC systems). Pursuant to ASC 840, Leases , the Company is deemed the "owner" for accounting purposes during the construction period, so is required to capitalize the construction costs on its Balance Sheet. If a portion of the construction costs are reimbursed via adjusted rental payments rather than at the time of construction or if the property is subject to a lease which fixes the rents for a significant percentage of its economic life, the Company is precluded from derecognizing the constructed assets from its Balance Sheet when construction is complete.

Additionally, certain stores and equipment leases were improperly recorded as operating leases, rather than capital leases.

As a result of these and other less significant accounting corrections, the Company will record additional property and financing obligations on its Balance Sheet. In the Company's Statements of Income, lease payments will be recognized as depreciation and interest expense, rather than rent expense (which the Company records in Selling, General and Administrative Expense). The corrections will have

- 35 -

no impact on the net increase or decrease in cash and cash equivalents reported in the Company's Statements of Cash Flows.

In conjunction with Ernst & Young LLP, the Company is working diligently to complete the restatement of the above-referenced financial statements. The Company expects to file the Second Quarter 10-Q and the restated 2010 Annual Report and First Quarter 10-Q, by no later than September 13, 2011, the expiration date of the extension period provided by Rule 12b-25 of the Securities Exchange Act of 1934, as amended.

99. Additionally, Kohl's disclosed that "correction of the previous accounting errors and the related financial statement restatements are expected to have the following impact" on the Company's financial results:

- The adjustments are expected to impact the classification of cash flows from operations, financing activities and investing activities, but will have no impact on the net increase or decrease in cash or cash equivalents reported in the Company's Statements of Cash Flows;

- Additional property and capital lease and financing obligations in yet-undetermined amounts will be recorded on the Company's Balance Sheet; and

- In addition to having a yet-undetermined impact on net income, the presentation of lease payments in the Company's Statements of Income will significantly change as they are expected to be recognized as depreciation and interest expense, rather than as rent expense, which the Company records in Selling, General and Administrative Expense.

100. Moreover, in contrast to Defendants' representations in the August 11, 2011 press release and Form 8-K (which disclosed financial formation for the second quarter that was subject to "adjustment" due to the anticipated restatements), the September 8, 2011 Form 12b-25 disclosed: (i) "[a]s a result of the foregoing, the Company is not able to provide a reasonable estimate of its second quarter results beyond net sales, comparable store sales and gross margin amounts indicated above"; and (ii) "[t]he above statements and description of expected adjustments are preliminary and subject to change based, among other things, on the Company's completion of the restatement of its financial statements discussed above."

- 36 -

101.     Additionally, Defendants now disclosed that until the restatements were completed

for fiscal year 2010 (*i.e.*, the period ending January 9, 2011) and the first fiscal quarter of 2011, "the

Company is not able to complete its financial statements for the quarterly period ended July 30,

2011" – *i.e.*, the second quarter, for which Defendants had already provided consolidated financial

information nearly one month earlier, on August 11, 2011.

102.     In response to these announcements, the price of Kohl's stock declined by nearly

2.5%, closing at $43.87 per share on September 8, 2011.  This decline was followed by a decline of

nearly 2.9% the next day, when the stock closed at $42.60 per share.

103.     On September 13, 2011, Kohl's filed with the SEC an amended 2010 Form 10-K (the

"Amended 2010 Form 10-K"), an amended 2011 Q1 Form 10-Q (the "Amended 2011 Q1 Form 10-

Q"), and the 2011 Q2 Form 10-Q.  Together, these filings contained restated financial information

covering fiscal years 2006 through 2010, as well as the first and second fiscal quarters of 2010 and

2011.  The restated financial information revealed that, as a result of the lease accounting problems,

Kohl's had materially understated its liabilities and debt (and other financial metrics), materially

overstated its equity (and other financial metrics), and materially misrepresented the adequacy and

efficacy of its internal and disclosure controls.

104.     For example, as a comparison of financial information contained in the 2010 Form

10-K and Amended 2010 Form 10-K shows (*see* Exhibit A, attached), the accounting errors resulted

in significant restatements for fiscal years 2006 through 2010.  As a comparison of the information

contained in the 2011 Q1 Form 10-Q and Amended 2011 Q1 Form 10-Q shows (*see* Exhibit B,

attached), the errors also resulted in significant restatements for the first fiscal quarter of 2011.

105.     Additionally, a comparison of financial information contained in the August 11, 2011

Form 8-K/press release and the 2011 Q2 Form 10-Q (*see* Exhibit C, attached), shows that the errors

- 37 -

resulted in significant restatements for the second fiscal quarter of 2011. The 2011 Q2 Form 10-Q also confirms that the errors resulted in the restatement of significant metrics for the six-month periods ending July 31, 2010 and July 30, 2011.

106. Finally, a comparison of the originally reported and restated financial information for the first and second fiscal quarters of 2010 (*see* Exhibits D and E, attached), as reported in the Amended 2011 Q1 Form 10-Q and the 2011 Q2 Form 10-Q, shows that the errors resulted in significant restatements for those quarters.

107. As the percentage differences represented in the charts below confirm, Kohl's had materially understated its liabilities (derived from subtracting shareholders' equity from total assets) and total assets and materially overstated its shareholders' equity.

(a) The following chart reflects the adjustments (required by the restatements) expressed as a percentage of the *restated* figures:

| | 2010 | 2009 | 2008 | 2007 | 2006 |
|---|---|---|---|---|---|
| Liabilities | −21.17% | −22.75% | −24.06% | −24.26% | −28.20% |
| Total Assets | −8.22% | −9.02% | −9.73% | −10.35% | −11.40% |
| Shareholders' Equity | +3.21% | +3.40% | +3.69% | +3.60% | +3.47% |

(b) The following chart reflects the adjustments (required by the restatements) expressed as a percentage of the *originally reported* figures:

| | 2010 | 2009 | 2008 | 2007 | 2006 |
|---|---|---|---|---|---|
| Liabilities | −26.86% | −29.45% | −31.68% | −32.03% | −39.27% |
| Total Assets | −8.96% | −9.92% | −10.78% | −11.55% | −12.87% |
| Shareholders' Equity | +3.11% | +3.29% | +3.56% | +3.47% | +3.36% |

108. A comparison between the data reported for the first and second fiscal quarters of 2011, with financial information extrapolated from the 2011 Q1 Form 10-Q and the August 11, 2011 press release and the Amended 2011 Q1 Form 10-Q and 2011 Q2 Form 10-Q, also shows that Kohl's had materially understated its liabilities (derived from subtracting shareholders' equity from total assets) and total assets and materially overstated its shareholders' equity for those periods.

- 38 -

(a)     The following chart reflects the adjustments (required by the restatements) expressed as a percentage of the *restated* figures:

|                     | Q1 2011   | Q2 2011   |
|---------------------|-----------|-----------|
| Liabilities         | –21.10%   | –21.04%   |
| Total Assets        | –8.16%    | –8.39%    |
| Shareholders' Equity | +3.46%    | +3.76%    |

(b)     The following chart reflects the adjustments (required by the restatements) expressed as a percentage of the *originally reported* figures:

|                     | Q1 2011   | Q2 2011   |
|---------------------|-----------|-----------|
| Liabilities         | –26.74%   | –26.65%   |
| Total Assets        | –8.89%    | –9.16%    |
| Shareholders' Equity | +3.35%    | +3.62%    |

109.     The chart below further shows how Kohl's materially understated its liabilities, with financial information extrapolated from data reported in the 2010 Form 10-K and for the first and second fiscal quarters of 2011 (including in the 2011 Q1 Form 10-Q and the August 11, 2011 press release), as well as data restated in the Amended 2010 Form 10-K, the Amended 2011 Q1 Form 10-Q and the 2011 Q2 Form 10-Q (dollars are expressed in millions):

| Liabilities | | | | |
|-------------|----------|----------|-----------------------|--------|
| Period      | Original | Restated | Understated (%)[1]    |        |
|             |          |          | A                     | B      |
| 2006        | $3,443   | $4,795   | 28.20%                | 39.27% |
| 2007        | 4,473    | 5,906    | 24.26%                | 32.04% |
| 2008        | 4,624    | 6,089    | 24.06%                | 31.68% |
| 2009        | 5,307    | 6,870    | 22.75%                | 29.45% |
| 2010        | 5,462    | 6,929    | 21.17%                | 26.86% |
|             |          |          |                       |        |
| Q1 2011     | 5,362    | 6,796    | 21.10%                | 26.74% |
| Q2 2011     | 5,369    | 6,800    | 21.04%                | 26.65% |

---

[1]     In the charts set forth herein, Column "A" reflects the adjustments (required by the restatements) expressed as a percentage of the *restated* figures; Column "B" reflects the adjustments (required by the restatements) expressed as a percentage of the *originally reported* figures.

- 39 -

110.    The chart below further shows how Kohl's materially understated its total assets, with financial information extrapolated from data reported in the 2010 Form 10-K and for the first and second fiscal quarters of 2011 (including in the 2011 Q1 Form 10-Q and the August 11, 2011 press release), as well as data restated in the Amended 2010 Form 10-K, the Amended 2011 Q1 Form 10-Q and the 2011 Q2 Form 10-Q (dollars are expressed in millions):

| Total Assets | | | | |
|---|---|---|---|---|
| Period | Original | Restated | Understated (%) | |
| | | | A | B |
| 2006 | $9,046 | $10,210 | 11.40% | 12.87% |
| 2007 | 10,575 | 11,796 | 10.35% | 11.55% |
| 2008 | 11,363 | 12,588 | 9.73% | 10.78% |
| 2009 | 13,160 | 14,465 | 9.02% | 9.92% |
| 2010 | 13,564 | 14,779 | 8.22% | 8.96% |
| | | | | |
| Q1 2011 | 13,186 | 14,358 | 8.16% | 8.89% |
| Q2 2011 | 12,713 | 13,878 | 8.39% | 9.16% |

111.    The chart below further shows how Kohl's materially overstated its shareholders' equity, with financial information extrapolated from data reported in the 2010 Form 10-K and for the first and second fiscal quarters of 2011 (including in the 2011 Q1 Form 10-Q and the August 11, 2011 press release), as well as data restated in the Amended 2010 Form 10-K, the Amended 2011 Q1 Form 10-Q and the 2011 Q2 Form 10-Q (dollars are expressed in millions):

| Shareholders' Equity | | | | |
|---|---|---|---|---|
| Period | Original | Restated | Overstated (%) | |
| | | | A | B |
| 2006 | $5,603 | $5,415 | 3.47% | 3.36% |
| 2007 | 6,102 | 5,890 | 3.60% | 3.47% |
| 2008 | 6,739 | 6,499 | 3.69% | 3.56% |
| 2009 | 7,853 | 7,595 | 3.40% | 3.28% |
| 2010 | 8,102 | 7,850 | 3.21% | 3.11% |
| | | | | |
| Q1 2011 | 7,824 | 7,562 | 3.46% | 3.34% |
| Q2 2011 | 7,344 | 7,078 | 3.76% | 3.62% |

- 40 -

112.    Further, the chart below shows how Kohl's materially overstated its net income, with financial information extrapolated from data reported in the 2010 Form 10-K and for the first and second fiscal quarters of 2011 (including in the 2011 Q1 Form 10-Q and the August 11, 2011 press release), as well as data restated in the Amended 2010 Form 10-K, the Amended 2011 Q1 Form 10-Q and the 2011 Q2 Form 10-Q (dollars are expressed in millions):

| Net Income | | | | |
|---|---|---|---|---|
| Period | Original | Restated | Overstated (%) | |
| | | | A | B |
| 2006 | $1,109 | $1,090 | 1.74% | 1.71% |
| 2007 | 1,084 | 1,060 | 2.26% | 2.21% |
| 2008 | 885 | 857 | 3.27% | 3.16% |
| 2009 | 991 | 973 | 1.85% | 1.82% |
| 2010 | 1,114 | 1,120 | (0.54)% | (0.54)% |
| | | | | |
| Q1 2011 | 211 | 201 | 4.98% | 4.74% |
| Q2 2011 | 299 | 303 | (1.34)% | (1.32)% |

113.    Additionally, as of January 29, 2011, Kohl's had materially understated its "total debt per balance sheet" and materially overstated its "capitalization," presented in the 2010 Form 10-K and Amended 2010 Form 10-K in connection with reporting the Company's indebtedness and capitalization for purposes of determining compliance with covenants imposed by debt agreements to which Kohl's is a party, including the Credit Agreement.  The charts below show the difference between the "total debt per balance sheet" and the "capitalization" originally reported in the 2010 Form 10-K and the restated figures set forth in the Amended 2010 Form 10-K, each as of January 29, 2011 (dollars are expressed in millions).

(a)    The following chart reflects the adjustments (required by the restatements) expressed as a percentage of the *restated* figures:

| | 2010 Form 10-K | Amended 2010 Form 10-K | Difference (%) |
|---|---|---|---|
| Total Debt Per Balance Sheet | $2,096 | $3,998 | 47.57% (understated) |
| Capitalization | $14,461 | $13,959 | 3.59% (overstated) |

- 41 -

(b)     The following chart reflects the adjustments (required by the restatements) expressed as a percentage of the *originally reported* figures:

| | 2010 Form 10-K | Amended 2010 Form 10-K | Difference (%) |
|---|---|---|---|
| **Total Debt Per Balance Sheet** | $2,096 | $3,998 | 90.74% (understated) |
| **Capitalization** | $14,461 | $13,959 | 3.47% (overstated) |

114.    Accordingly, Kohl's understated its "total debt per balance sheet" by $1.9 billion (or approximately 90.7%), and overstated its "capitalization" by $502 million (or approximately 3.6%) – figures that were publicly disseminated and made available to shareholders.

115.    Additionally, as a result of the nature of the accounting errors, Kohl's was forced to continually report the existence of material weaknesses in its disclosure and internal controls even after issuing the restatements and instituting various remedial measures to address the weaknesses.

116.    As Kohl's disclosed in its August 31, 2012 Form 10-Q for the second fiscal quarter ended July 28, 2012 (the "2012 2Q Form 10-Q"), the Company implemented remedial measures, as follows:

> To remediate the material weakness described above, we implemented remedial measures including a review of all of our leases to correct instances where we were not complying with generally accepted accounting principles ("GAAP"). In addition, we developed updated procedures to reflect the technical guidance for lease accounting and instituted additional management review to confirm the proper implementation of accounting standards going forward.

117.    More specifically, Kohl's disclosed the following in the 2012 2Q Form 10-Q with respect to these remedial measures:

> We have implemented the changes necessary to remediate the material weakness in our controls over the accounting for leases. These changes included a review of all of our leases to correct instances where we were not complying with GAAP, updated procedures to reflect the technical guidance for lease accounting and additional management review. There were no other changes in our internal control over financial reporting that have materially affected or are reasonably likely to materially affect such controls.

- 42 -

118. Nevertheless, in the 2012 2Q Form 10-Q, Defendants were forced to admit that they could not represent that the material weaknesses were resolved even as of July 28, 2012, disclosing: "Based upon the Evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective at a reasonable assurance level as of July 28, 2012." Accordingly, Kohl's was also forced to admit in the 2012 2Q Form 10-Q that "[d]uring the period covered by this report, we entered into several new lease transactions, but we did not have sufficient time to complete the necessary testing of the controls over accounting for leases to ensure that these controls were operating effectively."

119. Kohl's could not confirm that the material weaknesses in its disclosure and internal controls were remediated until August 2012, when it disclosed in the 2012 2Q Form 10-Q that it had "performed the testing necessary to determine that [its] controls and procedures for reporting periods subsequent to July 28, 2012 [we]re effective."

120. The market for Kohl's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Kohl's common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Kohl's common stock relying upon the integrity of the market price of Kohl's common stock and market information relating to Kohl's, and have been damaged thereby.

121. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Kohl's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that

- 43 -

they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

122.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Kohl's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Kohl's and its business, prospects and operations, causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing such common stock at artificially inflated prices, causing the damages complained of herein.

**Kohl's Financial Statements Were Not Prepared
in Conformity with GAAP and Were Misleading**

123.     SEC Regulation S-X [17 C.F.R. §210.4-01(a)(1)] provides that financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading or inaccurate.

124.     As detailed herein, and as Defendants have admitted (by virtue of the restatements and otherwise), the financial statements that Kohl's was required to restate during the Class Period were not prepared in conformity with GAAP and did not accurately reflect the Company's financial condition.

125.     Consequently, the financial statements subject to the restatements were presumptively misleading and inaccurate when filed, and Defendants are responsible for having issued such false and misleading statements to the investing public.

- 44 -

**The Credit Agreement Imposed Affirmative Covenants that Contained
False and Misleading Statements and Required Defendants
to Understand the Company's Financial Condition**

126.     Under the heading "Affirmative Covenants," the Credit Agreement required Kohl's to

provide financial statements, for each fiscal year end, not subject to qualification by an auditor.

Agr., §§7, 7.1(a).  Specifically, the relevant affirmative covenant required to furnish to each lender

"[a]s soon as available," but no later than 90 days after the end of each fiscal year, a copy of its

annual report on Form 10-K, with financial statements audited and "certified without Impermissible

Qualification by the Accountants."  Agr., §7.1(a).

127.     In pertinent part, the term "Impermissible Qualification" means "any opinion by the

Accountants as to any financial statement" subject to a qualification "which relates to the limited

scope of examination of matters relevant to such financial statement" (other than standard limiting

qualifications used by the accounting profession).  Agr., §1.1 (defining term).

128.     Additionally, the Credit Agreement provided that an "Event of Default" thereunder

would occur if, among other things, "[a]ny representation or warranty" by or on behalf of Kohl's in

"any Loan Document [defined to include the Credit Agreement (Agr., §1.1)] or in any certificate,

report, opinion . . . or other  document delivered or to be delivered pursuant thereto . . . shall prove to

have been incorrect or misleading (whether because of misstatement or omission) in any material

respect when made . . . ."  Agr., §9.1(e).

129.     Further, the Credit Agreement contained an affirmative covenant that required the

Company's CFO (or individual acting in a similar capacity) to provide a "Compliance Certificate"

"[w]ithin 45 days after the end of each of the first three fiscal quarters, and within 90 days after the

end of the last fiscal quarter, of each fiscal year . . . ."  Agr., §7.1(c).  Schedule 1 to the Form of

Compliance Certificate, prepared in accordance with Section 7.1(c) of the Credit Agreement,

- 45 -

required Kohl's (by and through its CFO) to "certify" as to the Company's indebtedness. Agr., Sch. 1 to Ex. E. Additionally, the Certificate required Kohl's to "certify" that "[t]here exists no violation of any covenant or agreement contained in any Loan Document, and no condition or event has occurred which would constitute a Default under the Credit Agreement," except as otherwise set forth in such Certificate. Agr., Ex. E, §2.

130. Finally, the Credit Agreement contained an affirmative covenant that required Kohl's to provide "[a]s soon as available," but no later than "45 days after the end of each of the first three fiscal quarters of each fiscal year," a copy of its quarterly report on Form 10-Q, with financial statements "complete and correct in all material respects" and prepared and presented "in accordance with GAAP . . . ." Agr., §7.1(b).

131. Accordingly, the Credit Agreement required Defendants to familiarize themselves with the Company's financial condition by imposing affirmative covenants on them that required them to provide accurate financial information to the lenders, not subject to qualification by the Company's auditors, in connection with the credit facility.

132. Additionally, the representations made in the "Affirmative Covenants" section of the Credit Agreement regarding the Company's financial condition were false and materially misleading when made, and further caused investors to believe that Kohl's financial statements were accurate and prepared in conformity with GAAP.

**The Credit Agreement Contained Representations and Warranties
that Were False and Misleading and Required Defendants
to Understand the Company's Financial Condition**

133. Under the heading "Representations and Warranties," Kohl's expressly made various representations and warranties in the Credit Agreement to the administrative agent, lenders, issuing

banks and others for the purpose of inducing them to participate in the credit facility or otherwise providing funding. In this regard, Section 4 provided the following:

> In order to induce the Administrative Agent and the Lenders to enter into this Agreement, the Lenders to make the Revolving Credit Loans, each Issuing Bank to Issue the Letters of Credit and the Lenders to participate therein, and each Swing Line Lender to make the Swing Line Loans and the Lenders to participate therein, the Borrower makes the following representations and warranties to the Credit Parties . . . .

134. In turn, Section 4.9, entitled "Financial Statements," provided, in pertinent part, that the Company's "Financial Statements fairly present in all material respects the Consolidated financial condition and results of the operations of the Borrower and its Subsidiaries as of the dates and for the periods indicated therein and have been prepared in conformity with GAAP." The Credit Agreement generally defines the term "Financial Statements" as "copies of the audited Consolidated balance sheets of the Borrower as of January 29, 2011, and the related Consolidated statements of operations, stockholder's equity and cash flows for the fiscal year then ended" (together "with the related notes and schedules"). Agr., §4.9.

135. As alleged herein, on August 11, 2011, the Company disclosed that, due to the lease accounting inaccuracies, "investors should no longer rely upon the financial statements" included in the 2010 Form 10-K or the 2011 Q1 Form 10-Q. Subsequently, Kohl's restated the financial results for the periods covered by those filings, as well as the second fiscal quarter of 2011 (which results Kohl's announced on August 11, 2011, subject to adjustments based on the restated figures). The financial statements subject to the restatements did not fairly present the Company's financial condition and were not prepared in accordance with GAAP, in violation of the representations and warranties contained in Section 4.9 of the Credit Agreement. Such violation gave rise to, and constituted, an Event of Default under the Credit Agreement. Agr., §9.1(e).

- 47 -

136.    Accordingly, the representations and warranties contained in the Credit Agreement pertaining to the Company's financial condition were false and materially misleading when made, and further caused investors to believe that Kohl's financial statements were accurate and prepared in conformity with GAAP.

137.    Further, the Credit Agreement required Defendants to familiarize themselves with the Company's financial condition because it required them to make the representations and warranties referenced above (and, as noted, the affirmative covenants required McDonald (as CFO) to certify as to certain financial matters related to Kohl's). Defendants consciously or recklessly disregarded the accuracy of their representations in the Credit Agreement and, by extension, the fact that those representations were disseminated publicly to investors in the Company's June 28, 2011 Form 8-K.

**Defendants Misrepresented the Adequacy and Efficacy of the Company's Disclosure and Internal Controls**

138.    Congress enacted Sarbanes-Oxley in 2002, in part to heighten the responsibility of public company directors and senior managers associated with the quality of financial reporting and disclosures made by their companies. The SEC revised Item 307 and added Item 308 of SEC Regulation S-K [17. C.F.R. 229.307 and 308] to require disclosure of the conclusions of a company's principal executive and financial officers on the effectiveness of disclosure controls and procedures and to disclose a report by management on internal control over financial reporting.

139.    Further, Rule 13a-15 (entitled "Issuer's Disclosure Controls and Procedures Related to Preparation of Required Reports"), promulgated by the SEC under the Exchange Act, generally defines the term "disclosure controls and procedures" as controls and other procedures designed to ensure that the information required to be disclosed to investors under the Exchange Act is recorded, processed, summarized and reported.

- 48 -

140.     According to Rule 13a-15: "Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the [Exchange] Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure."

141.     In turn, Rule 13a-15 defines the term "internal control over financial reporting" as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

142.     According to Rule 13a-15, internal control over financial reporting includes those policies and procedures that, among other things, "[p]ertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer" and "[p]rovide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles [GAAP] . . . ."

143.     As detailed above, Defendants Mansell and McDonald signed certifications during the Class Period, included in the Company's Forms 10-K and 10-Q, which attested to the adequacy and efficacy of the Company's disclosure and internal controls.

144.     In so doing, Defendants Mansell and McDonald misrepresented the adequacy and efficacy of the Company's disclosure and internal controls, because: (i) the Company intentionally employed "strategies" that were reasonably calculated to cause it to run afoul of lease accounting rules and principles of GAAP; (ii) the Company had undertaken a detailed review of the Company's

- 49 -

lease accounting practices, several years ago (which resulted in separate restatements in 2005) and more recently; and (iii) the Company had identified errors in its lease accounting, yet disregarded and affirmatively misrepresented their materiality.

**The Company's Earlier Restatements Resulted from
Improper Lease Accounting Practices**

145.    On February 22, 2005, Kohl's issued a Form 8-K, with an attached press release, disclosing that its "senior management," in consultation with E&Y, had reviewed the Company's lease accounting practices and decided to restate its financial statements beginning with the 1998 fiscal year through the first three quarters of fiscal year 2004.  At the time, Defendant Mansell served as the Company's President and as a member of its Board, while Defendant McDonald served as the Company's Executive Vice President and CFO.

146.    In the February 22, 2005 press release, Kohl's disclosed, in pertinent part, that "the commencement date of the lease term will be the earlier of the date when Kohl's becomes legally obligated for the rent payments or the date when the Company takes possession of the building for initial setup of fixtures and merchandise."  The subsequent lease accounting issues and restatements, which are the subject of this action, also involve inaccuracies resulting from the Company's failure to accurately account for having taken control of leased properties when making improvements.

147.    As the Company further disclosed in the February 22, 2005 press release, the 2005 restatements involved some of the same financial figures that had to be restated in the most recent round of restatements, including: (i) selling, general and administrative expenses; (ii) depreciation expenses; and (iii) net income.

148.    However, unlike when Kohl's issued its second fiscal quarter results on August 11, 2011 *without* reflecting adjustments required due to the lease accounting errors (which adjustments were reported in restated figures in the 2011 2Q Form 10-Q), Kohl's issued its financial results for

- 50 -

the fourth fiscal quarter and fiscal year 2004 in a press release (and Form 8-K) on February 24, 2005 purportedly *reflecting* the required adjustments. As Kohl's disclosed in the February 24, 2005 press release: "[t]he results above [regarding the 2004 fiscal fourth quarter and year] and the attached financial statements for both fiscal 2003 and 2004 reflect these adjustments."

149.    Accordingly, the Company and the Individual Defendants had previously engaged in a detailed review of the Company's lease accounting practices and elected to restate financial figures for several years in consultation with E&Y. In conjunction with the earlier restatement, however, the Company disclosed quarterly financial information that reflected the required adjustments – instead of disclosing information that Defendants knew would change, when restated.

## ADDITIONAL SCIENTER ALLEGATIONS

150.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Kohl's, their control over, and/or receipt and/or modification of Kohl's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

151.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of personnel at the highest levels of the Company, including the Individual Defendants.

- 51 -

152.     The Individual Defendants, because of their positions with Kohl's, controlled the contents of the Company's public statements during the Class Period. Each defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of these Defendants is responsible for the accuracy of Kohl's corporate statements and is therefore responsible and liable for the representations contained therein.

153.     Defendants' knowledge and/or reckless disregard of the false and misleading nature of the material misstatements now admitted to by the Company is further evidenced by Kohl's detailed examination of lease accounting errors purportedly discovered and corrected during the third quarter of 2010. Indeed, during the Class Period, Defendants represented that they corrected various errors, occurring over a number of years, related to the Company's accounting for leased properties and that such errors were not material to its previously reported financial statements. Moreover, Defendants represented that Kohl's had completed a "detailed review of each its leases" and the related accounting of such leases.

154.     Defendants' scienter is underscored by the Sarbanes-Oxley-mandated certifications of Defendants Mansell and McDonald, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Kohl's was made known to them and that the Company's disclosure related controls were operating effectively.

- 52 -

155.     Defendants were further motivated to engage in the course of conduct alleged herein in order to allow certain Company insiders to collectively sell shares of their personally held Kohl's common stock for gross proceeds of approximately $50.9 million during the Class Period, as depicted in the chart below:

| Filer Name | Title | Ownership | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| Brennan (Donald A) | Officer | D | 08-Oct-2009 | 14,700 | $59.00 | $867,300 |
| Herma (John F) | Director | I | 09-Sep-2009 | 55,315 | $55.95 | $3,094,874 |
| Herma (John F) | Director | I | 10-Sep-2009 | 19,055 | $55.59 | $1,059,267 |
| Herma (John F) | Director | I | 10-Sep-2009 | 25,630 | $55.56 | $1,424,003 |
| Herma (John F) | Director | D | 10-Jun-2010 | 39 | $51.29 | $2,000 |
| | | | | 100,039 | | $5,580,145 |
| Kellogg (William S) | Director | I | 09-Sep-2009 | 165,945 | $55.95 | $9,284,623 |
| Kellogg (William S) | Director | I | 10-Sep-2009 | 57,165 | $55.59 | $3,177,802 |
| Kellogg (William S) | Director | I | 10-Sep-2009 | 76,890 | $55.56 | $4,272,008 |
| Kellogg (William S) | Director | I | 10-Jun-2010 | 213 | $51.29 | $10,925 |
| | | | | 300,213 | | $16,745,358 |
| Mansell (Kevin) | CEO | I | 10-Sep-2009 | 50,000 | $55.76 | $2,788,000 |
| Mansell (Kevin) | CEO | I | 11-Sep-2009 | 88,000 | $55.55 | $4,888,400 |
| | | | | 138,000 | | $7,676,400 |
| McDonald (Wesley S) | CFO | D | 21-Sep-2009 | 2,000 | $56.00 | $112,000 |
| McDonald (Wesley S) | CFO | D | 09-Oct-2009 | 5,000 | $60.00 | $300,000 |
| McDonald (Wesley S) | CFO | D | 24-Nov-2010 | 2,000 | $56.25 | $112,500 |
| | | | | 9,000 | | $524,500 |
| Montgomery (R Lawrence) | Director | D | 08-Sep-2009 | 240,000 | $54.54 | $13,089,600 |
| Sica (Frank V) | Director | I | 10-Sep-2009 | 1,000 | $55.41 | $55,410 |
| Sommerhauser (Peter M) | Director | I | 09-Sep-2009 | 5,535 | $55.95 | $309,683 |
| Sommerhauser (Peter M) | Director | D | 09-Sep-2009 | 13,830 | $55.95 | $773,789 |
| Sommerhauser (Peter M) | Director | I | 10-Sep-2009 | 2,559 | $55.56 | $142,178 |
| Sommerhauser (Peter M) | Director | I | 10-Sep-2009 | 1,906 | $55.59 | $105,955 |
| Sommerhauser (Peter M) | Director | D | 10-Sep-2009 | 4,767 | $55.59 | $264,998 |
| Sommerhauser (Peter M) | Director | D | 10-Sep-2009 | 6,403 | $55.56 | $355,751 |
| Sommerhauser (Peter M) | Director | D | 21-May-2010 | 3,000 | $51.83 | $155,490 |
| | | | | 38,000 | | $2,107,843 |
| Worthington (John) | Officer | D | 16-Nov-2009 | 20,661 | $56.00 | $1,157,016 |
| Worthington (John) | Officer | D | 24-Nov-2010 | 9,700 | $56.92 | $552,124 |
| Worthington (John) | Officer | D | 24-Nov-2010 | 12,125 | $56.92 | $690,155 |
| Worthington (John) | Officer | D | 24-Nov-2010 | 4,000 | $56.98 | $227,920 |

| Filer Name | Title | Ownership | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| Worthington (John) | Officer | D | 31-Mar-2011 | 12,125 | $52.94 | $641,898 |
| Worthington (John) | Officer | D | 31-Mar-2011 | 4,286 | $52.97 | $227,029 |
| Worthington (John) | Officer | D | 31-Mar-2011 | 9,700 | $52.89 | $513,033 |
| Worthington (John) | Officer | D | 31-Mar-2011 | 4,000 | $52.92 | $211,680 |
| | | | | 76,597 | | $4,220,855 |
| | | Totals | | 917,549 | | $50,867,411 |

156.     These insiders did not engage in similar trading before or after the Class Period, as explained below:

(a)     Donald A. Brennan did not make any sales of Kohl's stock during 2010 and 2011 (he sold shares in October 2009).  He also did not make any sales in the two years after the Class Period ended (*i.e.*, 2012-2013).

(b)     John F. Herma did not sell any shares of Kohl's stock at least one year prior to the Class Period.

(c)     William S. Kellogg did not sell any shares of Kohl's stock at least one year prior to the start of the Class Period (he sold shares in September 2009).  He did not make any sales of Kohl's stock during 2011, and only made sales of stock during 2009 and 2010 as reflected in the above chart, in September 2009 and June 2010.

(d)     Defendant Mansell did not sell any shares of Kohl's stock at least one year prior to the start of the Class Period (he sold shares in September 2009).  He did not make any sales of Kohl's stock during 2011.

(e)     Defendant McDonald did not sell any shares of Kohl's stock at least one year prior to the start of the Class Period (he sold shares in September and October 2009).  He did not make any sales of Kohl's stock in 2011.

- 54 -

(f)     R. Lawrence Montgomery did not sell any shares of Kohl's stock at least one year prior to the start of the Class Period nor did he make any sales in the two years after the Class Period ended (*i.e.*, 2012-2013).

(g)     Frank V. Sica did not sell any shares of Kohl's stock at least two years prior to the start of the Class Period (he sold shares in September 2009).  He did not make any sales of Kohl's stock in 2010 or 2011, post-Class Period.

(h)     Peter M. Sommerhauser did not sell any shares of Kohl's stock at least one year prior to the start of the Class Period (he sold shares in September 2009).  He did not make any sales of Kohl's stock in 2011, post-Class Period.

(i)     John Worthington did not make any sales of Kohl's stock in 2011.

157.     Accordingly, the insider sales that took place during the Class Period were unusual and suspicious because they departed from the insiders' normal trading activity.  Moreover, to the extent that any of the Individual Defendants' sales took place pursuant to a Rule 10b5-1 trading plan, they consciously or recklessly disregarded adverse information concerning the Company's erroneous lease accounting practices, and the non-conformity of its financial statements with GAAP, to allow their sales to take place as scheduled.

## LOSS CAUSATION/ECONOMIC LOSS

158.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Kohl's common stock and operated as a fraud or deceit on Class Period purchasers of Kohl's common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Kohl's common stock fell precipitously as the prior artificial inflation came out.

- 55 -

159. As a result of their purchases of Kohl's common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Kohl's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $60.73 per share on October 14, 2009.

160. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Kohl's business and prospects. When the truth about the Company was revealed to the market, the price of Kohl's common stock fell precipitously. These declines removed the inflation from the price of Kohl's common stock, causing real economic loss to investors who had purchased Kohl's common stock during the Class Period.

161. The declines in the price of Kohl's common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Kohl's common stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Kohl's common stock and the subsequent significant decline in the value of Kohl's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

162. At all relevant times, the market for Kohl's common stock was an efficient market for the following reasons, among others:

(a)     Kohl's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Kohl's filed periodic public reports with the SEC and the NYSE;

(c)     Kohl's regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Kohl's was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

163.    As a result of the foregoing, the market for Kohl's common stock promptly digested current information regarding Kohl's from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Kohl's common stock during the Class Period suffered similar injury through their purchase of Kohl's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

164.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the

- 57 -

statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Kohl's who knew that those statements were false when made.

**COUNT I**

**Violation of §10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

165.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

166.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

167.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

168.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Kohl's common stock.  Plaintiffs and the Class would not have purchased Kohl's common stock at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' misleading statements.

169. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Kohl's common stock during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

170. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

171. The Individual Defendants acted as controlling persons of Kohl's within the meaning of §20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Kohl's, and their ownership of Kohl's common stock, the Individual Defendants had the power and authority to cause Kohl's to engage in the wrongful conduct complained of herein.

172. Additionally, the Individual Defendants committed primary violations of the federal securities laws, as detailed above.

173. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Lead Plaintiff as a Class Representative and Plaintiffs' Counsel as Class Counsel under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

- 59 -

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  December 27, 2013

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
JOSEPH RUSSELLO
EDWARD Y. KROUB


              */s/ Samuel H. Rudman*
            SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
jrussello@rgrdlaw.com
ekroub@rgrdlaw.com

*Lead Counsel for Plaintiffs*

K. SCOTT WAGNER
HALE & WAGNER, S.C.
839 N. Jefferson St., #400
Milwaukee, WI  53202
Telephone:  414/278-7000
414/278-7590 (fax)
ksw@halewagner.com

*Liaison Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Samuel H. Rudman, hereby certify that, on December 27, 2013, I caused a true and correct copy of the attached:

AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

to be served electronically on all counsel registered for electronic service for this case.

_/s/ Samuel H. Rudman_
Samuel H. Rudman