# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

PENSION TRUST FUND FOR
OPERATING ENGINEERS and CITY OF
STERLING HEIGHTS POLICE & FIRE
RETIREMENT SYSTEM, *individually and
on behalf of all others similarly situated*,

Plaintiffs,

v.

KOHL'S CORPORATION, KEVIN
MANSELL, and WESLEY S.
MCDONALD,

Defendants.

Case No. 13-CV-1159-JPS

**ORDER**

## 1.    INTRODUCTION

Nearly four years ago, various shareholders of Kohl's Corporation ("Kohl's" or "the company") filed this securities lawsuit against Kohl's and two of its officers concerning alleged devaluation of shares after the company disclosed that its accounting for lease agreements had not complied with generally accepted accounting principles ("GAAP"). The City of Sterling Heights Police and Fire Retirement System ("Retirement System") filed this case, and the Pension Trust Fund for Operating Engineers ("Pension Trust Fund") was later appointed lead plaintiff and filed an amended complaint, which is the operative pleading. (Docket #1, #39, and #42). The defendants filed their first motion to dismiss the amended complaint in February 2014, and it was denied without prejudice.

(Docket #43 and #58). On June 12, 2015, the defendants moved a second time to dismiss the amended complaint. (Docket #63).

In May of this year, the case was reassigned to this branch of the court following the retirement of Judge Charles Clevert, to whom it was originally assigned. At the time the case was reassigned, the defendants' (second) motion to dismiss the amended complaint had been pending unresolved for nearly two years. To be sure, such a delay in resolution is both inexplicable and unacceptable. Thus, this Court immediately requested supplemental briefing on the pending motion to allow the parties to update the Court on relevant case law from the past two years and now, having considered all the briefing on this motion, provides the parties a long overdue decision.

The amended complaint raises two causes of action against the defendants, first for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, and second for violations of Exchange Act Section 20(a). The defendants contend that the plaintiffs have not met the heightened pleading standards for securities fraud cases and ask this Court to dismiss the amended complaint. For the reasons stated herein, the Court will grant the defendants' motion and dismiss this case with prejudice.

## 2. STANDARD OF REVIEW

The defendants have moved to dismiss the plaintiffs' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). This rule provides for dismissal of complaints which fail to state a viable claim for relief. Fed. R. Civ. P. 12(b)(6). To state a viable claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint

must give "fair notice of what the . . . claim is and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (citation omitted).

In reviewing the plaintiffs' amended complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in [their] favor[.]" *Id.* at 480-81. However, a complaint that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). The Court must identify allegations "that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.

Further, Section 10(b) claims sound in fraud, and the rules of procedure require particularized pleading in fraud cases. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

In addition to the burden imposed by Rule 9, the Private Securities Litigation Reform Act ("PSLRA"), enacted by Congress as a check against abusive litigation in private securities fraud actions, heightens even further the pleading standards in actions such as this one. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 (2007). In charging misrepresentations or omissions of material fact, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation

regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Further, in alleging scienter, the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id*. § 78u–4(b)(2). Scienter is a mental state that, for these purposes, means "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (internal quotation marks omitted).

If either of the above criteria are absent—specificity in describing the alleged misrepresentations and a strong inference of scienter—the court must grant a defendant's motion to dismiss. 15 U.S.C. § 78u–4(b)(3)(A).

## 3.   THE AMENDED COMPLAINT[1]

The Retirement System and the Pension Trust Fund purchased Kohl's common stock between February 26, 2009 and September 13, 2011. They sue on behalf of themselves and a class of persons who purchased the common stock of Kohl's between those dates ("Class Period"). At all relevant times, Kohl's common stock was traded publicly on the New York Stock Exchange.

Kohl's operates department stores across the United States and a website, selling moderately-priced apparel, footwear, accessories, and home products targeted to middle-income consumers. As of January 28, 2012, Kohl's operated 1127 stores in 49 states. Approximately thirty-five

---

[1]All facts are taken from the amended complaint, (Docket #42), unless otherwise noted.

percent of the stores are owned by Kohl's and sixty-five percent are leased. The company's typical lease has an initial term of twenty to twenty-five years and four to eight renewal options for consecutive five-year extension terms. Most of the leases provide for a minimum annual rent that is fixed or adjusts to set levels during the lease term, including renewals, though some leases provide for additional rent based on a percentage of sales over designated levels.

Kevin Mansell ("Mansell") has served as Kohl's president and as a member of the company's board of directors since February 1999, as chief executive officer since August 2008, and as chairman of the board since September 2009. Wesley McDonald ("McDonald") has served as Kohl's chief financial officer since August 2003 and a senior executive vice president since November 2010. From August 2003 through November 2010, McDonald served as the company's executive vice president. During the Class Period, the individual defendants, as senior executive officers and directors of Kohl's, were privy to confidential and proprietary information concerning the company's operations, finances, financial condition, and present and future business prospects.

In February 2005, Kohl's disclosed that it had reviewed its lease accounting practices and concluded that they did not conform with GAAP. The errors required Kohl's to restate its financial results from fiscal year 1998 through the first three quarters of fiscal year 2004. In a February 2005 press release, Kohl's indicated that the restatements involved (i) selling, general and administrative expenses, (ii) depreciation expenses, and (iii) net income. Kohl's also indicated that the issue concerned "the commencement date of the lease term [being] the earlier of the date when Kohl's becomes legally obligated for the rent payments or the date when

the Company takes possession of the building for initial setup of fixtures and merchandise." (Docket #42 ¶ 146). When Kohl's issued its financial results for the fourth fiscal quarter and end of 2004, the numbers reflected the adjustments.

At the beginning of the class period, on February 26, 2009, Kohl's announced its earnings for the year ended January 31, 2009. On March 20, 2009, Kohl's filed with the Securities and Exchange Commission ("SEC") its Form 10-K for the year ended January 31, 2009, which was signed by Mansell and McDonald. The Form 10-K represented that the company's financial statements for that year were prepared and presented in conformity with GAAP, and Mansell and McDonald certified that the company's "disclosure controls and procedures are effective at the reasonable assurance level" and "internal control over financial reporting is effective." *Id.* ¶ 43-45. Mansell and McDonald certified that to their knowledge the report did not contain any untrue statement of material fact or omit a material fact necessary to make those statements not misleading. Further, they certified that, based on their knowledge, the financial statements and other financial information in the report "fairly present[ed] in all material respects the financial condition" of the company during the period. *Id.* ¶ 45.

The company's representations about internal and disclosure controls, and Mansell's and McDonald's certifications about the same, were repeated in all material respects in the Forms 10-K that Kohl's filed with the SEC during the remainder of the Class Period—March 2010 and March 2011—and in certifications included in the company's Forms 10-Q filed throughout the Class Period—June, September, and December 2009; June, September, and December 2010; and June 2011. The Forms 10-Q stated that

"[t]he accompanying financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information." *Id.* ¶¶ 48, 53, 61, 64. Mansell's and McDonald's certifications in the Forms 10-Q and Forms 10-K contained representations regarding the company's disclosure and internal controls, including their personal evaluation of such controls, to ensure they were adequate and effective.

On November 4, 2010, Kohl's announced that it had undertaken a detailed review of its historical accounting for leased properties, resulting in various corrections. Kohl's disclosed that these errors occurred over a number of years and primarily resulted from erroneously estimating the possession date in determining the commencement of lease terms; improperly accounting for and reporting certain asset depreciation; and improperly accounting for and reporting landlord reimbursements of construction-related costs. Kohl's reported that corrections of these errors were not material to its previously reported financial statements and so were recorded as a correction during that quarter through adjustments to depreciation, interest, and rent expense. Kohl's indicated that the correction would be up to $25 million, or $0.05 per diluted share.

However, according to the amended complaint, the company's improper lease accounting during the Class Period caused its reported liabilities and debt to be materially understated and its reported equity to be materially overstated. The plaintiffs allege that the defendants' representations that the accounting errors were not material "was false and misleading because Defendants knew or should have known the scope of the errors and the figures that had to be restated" because "Defendants had

previously engaged in a detailed review of the Company's lease accounting practices several years earlier, which also resulted in restatements." *Id.* ¶ 67.

Kohl's announced third-quarter earnings on November 10, 2010, for the quarter ended October 30, 2010. Kohl's indicated that its reported results excluded the corrections for its accounting for leased properties and that it intended to complete its review of that accounting prior to filing its third-quarter Form 10-Q. Kohl's presented its third-quarter financial information "subject to reclassification" and "before adjustments for lease accounting corrections." *Id.* ¶ 70. According to the amended complaint, the defendants at that time "knew that the results could or would materially change when taking into account the lease accounting corrections they had identified" and that it was materially misleading for the defendants "to publicly disseminate financial results they knew were subject to change" because the defendants knew or should have known by then which figures would change, while investors were unaware of which figures would change or the magnitude of such changes.

On December 2, 2010, Kohl's announced information regarding total sales for month ended November 27, 2010, reiterating therein that its review of historical accounting for leased properties required corrections to financial information but that the corrections were not material to its previously reported financial statements. However, Kohl's stated this time that it expected the final adjustment to decrease third-quarter income before taxes by approximately $50 million and dilute earnings per share by $0.10 per share. Again, the plaintiffs allege that the representation that the errors were not material to any previously reported period was false and misleading because the defendants knew or should have known by then

the scope and magnitude of the errors and the figures that needed to be restated.

On December 9, 2010, Kohl's filed its Form 10-Q for the quarter ended October 30, 2010. Like the other quarterly filings, the form represented that the company's financial statements for the quarter were prepared in accordance with GAAP and included representations about internal and disclosure controls and certifications by Mansell and McDonald about those controls. The form stated that all adjustments "considered necessary for a fair presentation have been included." *Id.* ¶¶ 73, 74. According to the amended complaint, the financial statements were not, in fact, prepared in accordance with GAAP and did not include all necessary adjustments for a fair presentation. Further, because of the accounting errors, Mansell's and McDonald's certifications regarding the adequacy of controls were false and misleading.

The December 9 Form 10-Q also, as with previous forms, disclosed the company's discovery of various errors in its accounting for leased properties, this time providing more detail. Kohl's indicated that the errors resulted from failures to properly determine the commencement of lease terms, record depreciation on certain assets consistent with the rent or lease obligation period, and classify and record landlord reimbursement of construction-related costs for leasehold improvements as prepaid rent or rent incentives. Kohl's detailed the line items of the financial statements that were impacted and assured the public that the corrections were not material to its previously reported financial statements. Kohl's did not disclose, at that time, the existence of any weaknesses in its internal controls. Kohl's stock declined approximately one percent on December 10, 2010.

Kohl's filed its Form 10-K on March 18, 2011, for the year ended January 29, 2011, and its Form 10-Q on June 1, 2011, for the quarter ended April 30, 2011. Again, these documents represented that the financial statements were prepared in accordance with GAAP and contained certifications from Mansell and McDonald about internal controls, all of which the plaintiffs, again, contend was false and misleading.

On June 28, 2011, Kohl's filed a Form 8-K disclosing that it had entered into a credit agreement for a revolving credit facility. The credit agreement, which McDonald signed, required that the defendants confirm the accuracy of the company's financial statements in accordance with GAAP. It also included a representation from Kohl's that its financial statements fairly presented in all material respects the company's financial condition. According to the amended complaint, the various financial statements discussed in the credit agreement were not prepared in accordance with GAAP and the certifications about controls were false and misleading because of the lease-accounting errors. Further, the statements in the credit agreement confirming that the financial statements were prepared in accordance with GAAP were false and misleading for the same reason.

On August 4, 2011, Kohl's issued a press release confirming that it had commenced a detailed review of its historical lease accounting practices to quantify the errors it had previously identified. This time, however, Kohl's represented that the adjustments resulting from the lease accounting issues "may be spread over a number of years, and may be material to one or more years." *Id.* ¶¶ 6, 88. Kohl's indicated that it and its accounting firm, Ernst & Young, LLP, expected to complete the review prior to filing the second-quarter Form 10-Q. According to the amended

complaint, the price of Kohl's stock declined on August 4, 2011 by nearly eight percent on heavy volume, closing at $47.67 per share.

One week later, on August 11, Kohl's announced its second-quarter earnings. Additionally, Kohl's disclosed that its audit committee, management, and auditor had concluded that investors should no longer rely on the financial statements included in the company's annual report on Form 10-K for the fiscal year ended January 29, 2011, or the company's quarterly report on Form 10-Q for the quarter ended April 30, 2011. Kohl's explained that it would "now recognize lease payments as depreciation and interest expense, rather than rent expense" and that it was then unable to provide a reasonable estimate of the impact by reporting period or financial-statement line item. Kohl's indicated that it would issue restatements and file its second-quarter Form 10-Q late. According to the amended complaint, it was materially misleading for the defendants to issue financial information that they knew would change, as investors could not differentiate between reliable and unreliable information.

Also on August 11, Kohl's filed a Form 8-K with the SEC reiterating that as a result of errors related to its accounting for leases, investors should no longer rely upon the financial statements included in the 2010 Form 10-K and the 2011 first-quarter Form 10-Q. In this form, Kohl's explained the accounting issue in more detail:

> The most significant errors are the result of misinterpretations of accounting literature related to leases where the lessee (the Company in this case) is involved in asset construction. Historically, the Company has been extensively involved in the construction of leased stores. In many cases, the Company is responsible for construction cost over runs or is responsible for non-standard tenant improvements (i.e. roof or HVAC

systems). Pursuant to ASC 840, Leases, the Company is deemed the "owner" for accounting purposes during the construction period, so is required to capitalize the construction costs on its Balance Sheet. If a portion of the construction costs are reimbursed via adjusted rental payments rather than at the time of construction or if the property is subject to a lease which fixes the rents for a significant percentage of its economic life, the Company is precluded from derecognizing the constructed assets from its Balance Sheet when construction is complete.

Additionally, certain stores and equipment leases were improperly recorded as operating leases, rather than capital leases.

As a result of these and other less significant accounting corrections, the Company will record additional property and financing obligations on its Balance Sheet. In the Company's Statements of Income, lease payments will be recognized as depreciation and interest expense, rather than rent expense (which the Company records in Selling, General and Administrative Expense). The corrections will have no impact on the net increase or decrease in cash and cash equivalents reported in the Company's Statements of Cash Flows.

*Id.* ¶ 92. Kohl's disclosed that management was evaluating the effect of these errors on the company's prior conclusions regarding the adequacy of its internal controls over financial reporting and its disclosure controls and procedures: "[M]anagement currently expects to conclude that one or more material weaknesses in such controls and procedures was present during each of the applicable restatement periods." *Id.*

That day, Mansell and McDonald held a conference call with investors and analysts to discuss the second-quarter financial results. McDonald prefaced the call with a statement that the historical results and guidance that would be discussed did not include any adjustments that

could result from the lease accounting corrections the company had disclosed earlier that day. During the call, McDonald indicated that the lease-accounting issues arose as a result of "several leasing strategies" that the company employed, whereby Kohl's elects to substantially improve leased properties. As McDonald explained:

> [Kohl's] determined that many of our strategies in negotiating leases and in renovating and constructing stores have put us in a position of holding an ongoing financial interest or in having control of the building. We have had several leasing strategies that have caused the accounting issues. First, situations where we construct the building for the landlord, but receive a portion of the reimbursement through reduced rent over the term of the lease rather than upfront when we incur the construction costs.
>
> Second, our leases generally have renewal options at fixed rates, which cover substantially all of the building's economic life. And finally, we often make improvements that are more significant than normal tenant improvements—replacing a roof or installing an HVAC system as examples.
>
> These strategies do not change the legal ownership of the store, but do require us to record the property and corresponding liability on our books. The corrections will also recategorize rent expense as depreciation and interest expense.

*Id.* ¶ 94. McDonald also discussed the second-quarter financial results despite the fact that they would be restated. For instance, he referenced quarterly depreciation expense of $163 million, which was later restated to be $190 million, and quarterly net interest expense of $27 million, which was later restated to be $72 million.

The amended complaint asserts that by August 11, 2011, the defendants knew or should have known which metrics were likely to materially change in the upcoming restatements as a result of the lease accounting errors because Kohl's had engaged in an extensive investigation of its lease-accounting practices and "had to have known which metrics were more subject to change than others." *Id.* ¶ 97.

On September 8, 2011, Kohl's provided additional statements about the impact of its lease accounting errors. The company notified the SEC that it was unable to file its Form 10-Q for the second quarter due to various errors in accounting for store and equipment leases. Kohl's reiterated the lease accounting discussion quoted above from the August 11, 2011 Form 8-K. Kohl's stated that it would file its Form 10-Q by September 13. However, in contrast to the company's discussion of second-quarter results on August 11, the company on September 8 stated that because of the accounting issues, it was "not able to provide a reasonable estimate of its second quarter results beyond net sales, comparable store sales and gross margin amounts" and that any discussion of expected adjustments was preliminary and subject to change. *Id.* ¶ 100. The company's stock price declined almost 2.5% that day, closing at $43.87 per share, and 2.9% the next day, closing at $42.60 per share.

On September 13, 2011—the end of the Class Period—Kohl's issued restatements covering fiscal years 2006 through 2010 and the first two quarters of 2011. The restated figures showed that Kohl's had significantly understated its total assets while overstating net income and capitalization. Additionally, Kohl's disclosed the existence of material weaknesses in its disclosure and internal controls and had to implement various corporate remedial measures. Kohl's filed with the SEC its amended Form 10-K for

the 2010 year, amended Form 10-Q for the first quarter of 2011, and the 2011 second-quarter Form 10-K. Together, the filings contained restated financial information covering fiscal years 2006 through 2010 and the first two fiscal quarters of 2010 and 2011. The financial statements that Kohl's was required to restate were not prepared in conformity with GAAP and did not accurately reflect the company's financial condition.

In subsequent SEC filings, Kohl's continued to report the existence of material weaknesses in its disclosures and internal controls and the implementation of remedial measures. Even as of July 28, 2012, Mansell and McDonald could not certify at a reasonable assurance level that the disclosure controls and procedures were effective. Then, in August 2012, Kohl's disclosed that it had performed the testing necessary to determine that its controls and procedures for reporting periods after July 28, 2012, were effective.

Because of their positions at Kohl's, Mansell and McDonald directly or indirectly controlled the conduct of Kohl's and its issuance of public statements, including the content of reports, press releases, and presentations to securities analysts and the public. Mansell and McDonald were provided copies of the company's reports and press releases prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected if misleading.

According to the amended complaint, Mansell's and McDonald's misrepresentations about the adequacy and efficacy of the company's disclosure and internal controls must have been either intentional or reckless because Kohl's employed purposeful "strategies" in terms of leasing that would cause it to run afoul of lease accounting rules and GAAP; Kohl's had undertaken a detailed review of its lease accounting practices

years before, resulting in restatements in 2005, from which it should have learned how to apply lease accounting rules correctly; and Kohl's had identified errors in its lease accounting at the time it issued financial statements during the Class Period that it knew were subject to change.

Further, the plaintiffs allege that the defendants consciously misrepresented or recklessly disregarded the company's improper lease accounting practices for the purpose of facilitating insider sales of almost $51 million in Kohl's stock. Specifically, the plaintiffs allege that Mansell sold over $7 million in stock during the Class Period, McDonald sold $524,500, and seven other Kohl's officers and directors sold a total of over $42 million. According to the plaintiffs, these insiders did not engage in similar trading before or after the Class Period.

Finally, the plaintiffs assert that, as a result of the allegedly materially false and misleading statements and failures to disclose, they and other class members purchased Kohl's common stock at artificially inflated prices during the Class Period.

## 4.    ANALYSIS

The plaintiffs bring two claims in this lawsuit. The first is alleged against all defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5. For this claim, the plaintiffs allege that the defendants disseminated or approved materially false and misleading statements that they knew were, or deliberately disregarded as being, misleading, causing the plaintiffs damages through the purchase of Kohl's stock at artificially inflated prices. According to the plaintiffs, Mansell and McDonald were involved in this fraud personally—they consciously or recklessly disregarded significant deficiencies in the company's lease accounting

practices and allowed the company to present financial statements that did not conform with GAAP.

In their second claim, the plaintiffs allege that Mansell and McDonald violated Section 20(a) of the Exchange Act. This claim is dependent on the success of the first. That is, to state a claim under Section 20(a), the plaintiffs must first adequately plead a primary violation of securities laws—here, a violation of Section 10(b) and Rule 10b–5. *See Pugh*, 521 F.3d at 693. Accordingly, the Court will proceed first by examining whether the plaintiffs have sufficiently pled a primary violation of the securities laws.

### 4.1    Exchange Act Section 10(b) and Rule 10b-5

Section 10(b) of the Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 forbids a company or an individual from "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim under Section 10(b), a plaintiff must sufficiently allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh*, 521 F.3d at 693.

In their pending motion, the defendants challenge whether the plaintiffs have sufficiently alleged the required state of mind for a Section

10(b) claim, *i.e.* scienter, to avoid dismissal under the PSLRA. As explained above, the PSLRA imposes heightened pleading standards for securities fraud complaints alleging misrepresentations. *See Tellabs,* 551 U.S. at 313. Among other special requirements, the PSLRA requires plaintiffs to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2). "The 'strong inference' standard unequivocally raise[s] the bar for pleading scienter[.]" *Tellabs,* 551 U.S. at 321 (internal quotation marks and formatting omitted); *see also Pugh,* 521 F.3d at 693. To qualify as "strong" under the PSLRA, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314.

In determining whether a complaint's allegations survive the PSLRA's requirement of a "strong inference" of scienter, the district court, considering the complaint in its entirety, must "engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." *Id.* Thus, this Court is "to weigh the strength of the plaintiffs' inferences in comparison to plausible, nonculpable explanations for the defendants' conduct." *Pugh,* 521 F.3d at 693 (citing *Tellabs,* 551 U.S. at 314).

Finally, because the Seventh Circuit has rejected the "group pleading doctrine" regarding attribution of statements to a group of officers involved in company operations, the plaintiffs must create a strong inference of scienter as to each individual defendant. *Pugh,* 521 F.3d at 693.

The plaintiffs attempt to plead scienter in two primary ways: first by alleging that the defendants had access to information demonstrating the falsity of the financial statements they distributed publicly and therefore

must have provided the false information either intentionally or recklessly, and second by alleging that Mansell, McDonald, and other Kohl's executives were motivated to provide false information that would keep the price of Kohl's stock artificially high at the time they sold a significant amount of their shares.

### 4.1.1   Access to Information

The defendants submit that dismissal is required because the plaintiffs' "conclusory allegations that the individual defendants knew, or consciously ignored, that Kohl's was not properly accounting for store leases do not support a strong inference of scienter." (Docket #64 at 20). The thrust of the defendants' argument on this point is that merely alleging that Kohl's committed accounting violations—even significant ones that required the restatement of financials over several years—is not sufficient to demonstrate that those who provided information to the public containing such accounting errors did so knowing the information was false or with reckless disregard for its falsity. *Id.* at 20-25.

The plaintiffs posit that they have sufficiently alleged scienter through their allegations that "Kohl's indisputably knew the applicable accounting rules; its Class Period lease accounting improprieties and restatements, which are extensive and cover a lengthy period, are substantially identical to those reported in February 2005; it reviewed its lease accounting practices multiple times; and [Mansell and McDonald] were obligated to verify, certify and ensure the accuracy of Kohl's financial accounting." (Docket #67 at 11).

More specifically, the plaintiffs claim that Kohl's had knowledge of the accounting rules, violations of which caused the restatements in 2011, because the company learned and recited one of the rules—regarding the

commencement date of a lease term—during a prior restatement in 2005 and because the SEC provided guidance in February 2005 about the other rules—regarding depreciation and construction-related costs and landlord reimbursements/incentives. *Id.* at 11-13. "Notwithstanding Defendants' knowledge and understanding of these rules in 2005," the plaintiffs argue, "Kohl's consistently violated them from fiscal year 2006 to 2011." *Id.* at 13. Further, according to the plaintiffs, "the 2011 restatements largely involved the same accounting improprieties as the 2005 restatements and otherwise resulted from violations of accounting rules that Defendants knew in 2005." *Id.* at 14. And the 2011 restatements were significant; they covered a period of many years and numerous line items, and included metrics like an understatement of liabilities by over $1.35 billion from fiscal year 2006 to the second fiscal quarter of 2011 and an overstatement of shareholders' equity by $188 million (3.4%) in 2006 and $266 million (3.6%) in the second quarter of 2011. *Id.* at 17.

Though the plaintiffs' lengthy amended complaint alleges with particularity the accounting errors that Kohl's made during the Class Period and ultimately disclosed publicly, it does not allege with the required particularity that the defendants knew that Kohl's accounting personnel and the company's outside auditor were committing such errors or that the defendants' failure to recognize the errors was "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant[s] or so obvious that the

defendant[s] must have been aware of it." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) (citation omitted).[2]

Indeed, knowing an accounting rule and knowing that it is not being followed by your company's accountants are two different things. *Cf. Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) (there is "a big difference between knowing about . . . reports . . . and knowing that the reports are false"). The amended complaint provides details about the history of Kohl's accounting errors and their effect on the company's financial statements, but it contains very little factual information that ties any individual defendant directly to the receipt of information or knowledge that would contradict a statement he made during the Class Period.

For example, it is not enough to allege that the company in general, as opposed to any particular defendant, made statements to the public that were false and misleading. *See, e.g,* (Docket #42 ¶ 91) ("It was materially misleading for Defendants to issue financial information they knew would change. . . . Defendants knew or should have known which information would be restated, but they issued the inaccurate second quarter results anyway."). The Seventh Circuit rejects the "group pleading doctrine"—the "judicial presumption that statements in group-published documents

---

[2]The parties disagree over whether Kohl's 2011 restatement involved substantially the same accounting improprieties as the 2005 restatement, which the plaintiffs view as additional evidence of scienter. *See, e.g.,* (Docket #67 at 5); (Docket #71 at 9). At this stage of the litigation, it would be improper for the Court to decide an issue of fact such as this. But that is of no moment to the Court's decision, because even if the errors Kohl's made in 2005 were repeated in the years that followed, the plaintiffs have not sufficiently alleged that the defendants knew or were reckless in not knowing that the technical and complex lease accounting rules were again being misapplied.

including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations." *Makor Issues & Rights, Ltd.,* 513 F.3d at 708; *Pugh,* 521 F.3d at 694; *Takara Trust v. Molex Inc.,* 429 F. Supp. 2d 960, 980 (N.D. Ill. 2006) ("Thus, the 'group pleading presumption'—which assumes that false or misleading group-published information contained in SEC filings or press releases are the collective actions of the officers—does not apply to securities fraud actions post-PSLRA.").

Similarly, it is also not enough to allege that Mansell and McDonald made certifications in public filings and in a private credit agreement about the company's financials and controls that turned out to be false. Executives' signatures on the SEC filings, Sarbanes-Oxley certifications, and the credit agreement stating they had personally evaluated and certified the effectiveness of the company's controls and procedures does not suffice to allege scienter without allegations that those executives were aware of the material weaknesses in the company's controls at the time they signed those statements or that such weaknesses were obvious. "[I]f an allegation that a mandatory Sarbanes–Oxley certification was later proved to be inaccurate is sufficient to give rise to the requisite strong inference, 'scienter would be established in every case where there was an accounting error or auditing mistake by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.'" *Plumbers & Pipefitters Local Union v. Zimmer,* 673 F. Supp. 2d 718, 748 (S.D. Ind. 2009), *aff'd by Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.,* 679 F.3d 952 (7th Cir. 2012) (citations omitted); *In re Harley-Davidson, Inc. Sec. Litig.,* 660 F. Supp. 2d 969, 995 (E.D. Wis. 2009) ("[I]t is insufficient to assert that defendants must have been aware of the

misstatement based on their positions within the company.") (quotation omitted).

The plaintiffs are adamant that Mansell and McDonald *should have known* about the problems with the company's lease accounting and controls at the time they made their certifications because the company had reviewed its lease accounting practices multiple times and Mansell and McDonald were obligated to verify, certify and ensure the accuracy of Kohl's financial accounting. (Docket #67 at 11). But even that falls short; allegations that corporate defendants should have identified a problem might constitute negligence, but that is not the state of mind required for fraud. *See Fulton County Employees Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1050 (7th Cir. 2012).

For example, the amended complaint does not include allegations that the company's auditors alerted Mansell, McDonald, or anyone else at Kohl's to errors in the company's lease accounting before the review that ultimately led to the 2011 restatement. The accounting rules the plaintiffs allege were violated are complex and technical, and the plaintiffs have not alleged with sufficient particularity why or how senior executives at Kohl's would have been so familiar with those rules so as to see a problem in the company's accounting before their auditors did. *See, e.g., In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014) (rejecting a finding of scienter, in part, because "the Complaint does not allege that Turquoise Hill's auditors disapproved of SouthGobi's accounting practices or found any lack of internal controls prior to the restatement"). Indeed, outside auditors are required under the Exchange Act to report material illegal acts to company management and the audit committee and, if not rectified, to the SEC. *See* 15 U.S.C. § 78j-1(b). For this reason, too, the

plaintiffs' failure to allege that the company's auditor expressed concern undermines an inference of fraudulent intent.

Finally, even in the rare instance where the amended complaint ties one of the individual defendants directly to a statement purportedly revealing his knowledge of fraud, there is a much more plausible nonculpable inference to be gleaned from the facts as alleged. *See Tellabs,* 551 U.S. at 324. Specifically, the plaintiffs point to a statement by McDonald, during an investor call announcing the 2011 restatement, that Kohl's employed "leasing strategies" as part of its business model; the plaintiffs argue this statement is an admission "that Kohl's accounting misconduct was a way of doing business, not an innocent mistake or harmless misunderstanding." (Docket #67 at 2). In other words, the plaintiffs invite the Court to interpret McDonald's statement to mean that Kohl's nefariously strategized ways to flaunt the accounting rules for leases and eventually owned up to its scheme in the restatement. But that inference is not as compelling as the opposing inference the defendants suggest—that "this innocuous statement merely reflects that Kohl's, a national retail chain of more than 1,100 stores (over 700 of which are leased), unsurprisingly had strategies for leasing stores." (Docket #64 at 3).

It is true that Kohl's undertook extensive reviews of its lease accounting practices before and during the Class Period. But the most one can impute to the defendants from this fact is that, sometime prior to the initiation of the reviews that led to the 2011 restatement, someone at Kohl's learned enough to lead the company to believe the reviews were necessary. And that is exactly what the company did, "demonstrating a pursuit of truth rather than reckless indifference to the truth." *Higginbotham,* 495 F.3d at 758. After all, "[k]nowing enough to launch an investigation . . . is a very

great distance from convincing proof of intent to deceive." *Id.* The plaintiffs'
allegations that the defendants had access to information alerting them to
the falsity of their public statements are not sufficient to give rise to a strong
inference that the defendants acted with the state of mind required by the
PSLRA. *See* 15 U.S.C. § 78u–4(b)(2).

### 4.1.2   Stock Sales

Next, the plaintiffs attempt to plead scienter by alleging that Mansell
and McDonald were motived to mispresent Kohl's' financials so that they,
and other company executives, could sell large amounts of shares of their
company stock during the Class Period at inflated prices.

Personal financial gain may weigh in favor of a scienter inference.
*Tellabs*, 551 U.S. at 325. However, because executives sell stock frequently,
"stock sales must generally be unusual or suspicious to constitute
circumstantial evidence of scienter" in a Section 10(b) case. *Pugh*, 521 F.3d
at 695. A "complaint that merely sets forth the aggregate amount of shares
sold during the class period and the value of those shares" without
providing any context demonstrating that those sales were unusual or
suspicious is insufficient to demonstrate a strong inference of scienter. *Id.*

The plaintiffs allege that while Kohl's' accounting violations were
concealed, Mansell, McDonald, and other company insiders collectively
sold nearly $51 million in stock at prices that "far exceeded" Kohl's stock
price of $43.94 per share on the last day of the Class Period. (Docket #67 at
28); (Docket #42 ¶ 155). The amended complaint sets forth dates, numbers
of shares sold, and value of the shares sold for nine executives, including
Mansell and McDonald, during the Class Period. Mansell's sales during the
Class Period generated proceeds of $7,676,400 and McDonald's sales
generated $524,000. (Docket #42 ¶ 155). These allegations alone, of course,

are insufficient to demonstrate scienter because they include no context in which the Court could consider the import of the trades—for example, whether they represent a significant percentage of the defendants' total holdings or whether they were offset by later purchases of shares.

Recognizing they must plead something more than aggregate sales to support this theory of scienter, the plaintiffs offer up one more allegation: that the stock-trading corporate insiders "did not make similar sales before or after the Class Period." *Id.* ¶ 156. For Mansell and McDonald, the amended complaint states that no sales of Kohl's stock were made for at least one year prior to the start of the Class Period or during the year 2011. *Id.* For other executives, the amended complaint makes statements about the lack of sales for up to two years prior to and after the end of the Class Period. *Id.* Even with these additional facts, the plaintiffs fall short of providing enough to "allow an assessment of whether the trading during the class period was unusual or suspicious." *Pugh*, 521 F.3d at 695. Alleging an absence of sales for one year preceding a class period that runs two-and-a-half years does not provide enough information to demonstrate a pattern, let alone an unusual one. Further, the amended complaint shows that each of the nine executives whose trades are documented made very few trades during the Class Period, a fact that might be enough to suggest the executives are infrequent traders but not enough to suggest those trades were unusual or suspicious.

In sum, the plaintiffs have not met their burden under the PSLRA to "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Pugh*, 521 F.3d at 693. Any inference that the defendants intentionally or recklessly misled the market is not more cogent than other nonculpable

inferences that may be taken from the allegations in the amended complaint. A holistic view of the amended complaint does not support an inference of scienter, and therefore the plaintiffs' Section 10(b) claim must be dismissed.

### 4.2 Exchange Act Section 20(a)

The plaintiffs' second claim arises under Section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a). It is brought against the individual defendants—Mansell and McDonald—as "controlling persons" of Kohl's by reason of their positions as officers and directors of Kohl's and their ownership of Kohl's common stock. Section 20(a) states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person[.]" *Id.* Thus, to state a claim under Section 20(a), the plaintiffs must first adequately plead a primary violation of securities laws—here, a violation of Section 10(b) and Rule 10b–5. *Pugh*, 521 F.3d at 693. Because the plaintiffs fail to state a claim under Section 10(b) or Rule 10b-5 as discussed above, there can be no liability under Section 20(a).

### 5. CONCLUSION

The parties to this case have waited far too long for resolution of the defendants' pending motion to dismiss. Having considered the parties' briefing filed nearly two years ago in support of and in opposition to this motion, as well as the supplemental briefing the Court requested after the case was reassigned hereto, the Court will now grant the defendants' motion to dismiss the amended complaint.

The Court's dismissal will be without leave to amend, and thus with prejudice. While this case was before Judge Clevert, the defendants brought

their first motion to dismiss the amended complaint, and Judge Clevert denied the motion because it relied too heavily on exhibits that he found were not appropriate for the court to consider in a Rule 12(b) motion. In his dismissal order, Judge Clevert put the plaintiffs on notice of weaknesses in the amended complaint and offered them an opportunity to again amend their pleading before the next round of motion practice. The plaintiffs chose to stand on the amended complaint as filed. (Docket #61). If the plaintiffs could allege facts sufficient to state a claim for securities fraud, they should have done so in one of the several opportunities already afforded to them.

Accordingly,

**IT IS ORDERED** that the defendants' motion to dismiss the amended complaint (Docket #63) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice.**

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 20th day of July, 2017.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge